RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0025p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

RANDY HAIGHT,

*Petitioner-Appellant,*

No. 17-6095

*v.*

SCOTT JORDAN, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:02-cv-00206—Gregory N. Stivers, District Judge.

Argued:  June 24, 2021

Decided and Filed:  February 9, 2023

Before:  GIBBONS, ROGERS, and STRANCH, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:**  John M. Bailey, Brentwood, Tennessee, Bruce P. Hackett, Floyds Knobs, Indiana, for Appellant.  Matthew R. Krygiel, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.  **ON BRIEF:**  John M. Bailey, Brentwood, Tennessee, Bruce P. Hackett, Floyds Knobs, Indiana, for Appellant.  Matthew R. Krygiel, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

The court delivered a PER CURIAM opinion in which STRANCH, J., joined except as to Section III.C.  STRANCH, J. (pp. 49–68), delivered a separate dissenting opinion.

---

**OPINION**

---

PER CURIAM. Petitioner Randy Haight, who was sentenced to death, appeals the district court's judgment dismissing his 28 U.S.C. § 2254 petition for a writ of habeas corpus, raising twenty-three grounds on appeal. We affirm the judgment of the district court.

I.

In 1994, Haight was convicted of the 1985 robberies and murders of Patricia Vance and David Omer, who were found shot to death in the back of Omer's station wagon in rural Garrard County, Kentucky. Haight, who had escaped from the Johnson County Jail several days before the murders, was captured in a nearby cornfield after a brief chase. During the chase, police officers discovered the victims' possessions and both handguns used to commit the murders in a stolen pickup truck abandoned by Haight.

Haight initially pled guilty to the murders in exchange for the prosecutor's recommendation of a life sentence without parole for twenty-five years on each count of murder and twenty years on each count of robbery, to be served concurrently. The trial court accepted Haight's guilty plea but rejected the prosecutor's recommendation and sentenced him to death. On direct appeal, the Kentucky Supreme Court vacated the conviction on the ground that the trial court should not have accepted a guilty plea premised on the parties' "understanding" that the court would sentence Haight in accordance with the agreement when in fact the court retained discretion in sentencing. *Haight v. Commonwealth*, 760 S.W.2d 84, 89 (Ky. 1988) ("*Haight I*"). Haight then sought specific enforcement of the terms of the plea agreement, to no avail. *Haight v. Williamson*, 833 S.W.2d 821 (Ky. 1992) ("*Haight II*"), *cert. denied*, 507 U.S. 925 (1993). Haight was then allowed to withdraw his guilty plea and go to trial, which began in late January 1994.

Haight admitted to the murders from the witness stand during the guilt phase of trial. His defense was that he was suffering from "extreme emotional disturbance" at the time of the crimes. The same theory was presented at the mitigation phase to convince the jury to impose a

sentence less than death. Haight maintained that at the time of his escape from jail several days before the murders, he was extremely emotionally and mentally disturbed due to his obsession with fellow inmate and escapee Mabel Music, a woman with whom he had a sexual relationship while in jail. After his escape with Mabel and another inmate, Haight embarked on a drinking binge, and Mabel abandoned him. Haight argued to the jury that due to his drinking and Mabel's departure, he was at the time of the shootings completely irrational, severely intoxicated, and extremely disturbed, all of which caused him to act impulsively. The jury rejected Haight's defense and found him guilty of both counts of intentional murder, both counts of first-degree robbery, and one count of possession of a firearm by a convicted felon.

The penalty phase began on February 1, 1994, immediately after the guilt phase was completed. Haight was sentenced to death for each murder, concurrent twenty-year terms of imprisonment for each robbery, and a concurrent five-year term for the firearm conviction. Haight's convictions and penalties were affirmed on direct review, *Haight v. Commonwealth*, 938 S.W.2d 243 (Ky. 1996) ("*Haight III*"), *cert. denied*, 522 U.S. 837 (1997), and Haight was subsequently denied postconviction relief without discovery or an evidentiary hearing on any of his claims, including ineffective assistance of counsel. *Haight v. Commonwealth*, 41 S.W.3d 436 (Ky. 2001) ("*Haight IV*"), *cert. denied*, 534 U.S. 998 (2001).

On April 12, 2002, Haight filed his petition for writ of habeas corpus and requested that the district court stay the habeas proceeding while he exhausted certain state claims not related to the ineffective assistance of trial counsel mitigation claim at issue. The district court stayed the federal action in November 2002. In state court, after briefing, the Kentucky Court of Appeals found it lacked jurisdiction to address the merits of Haight's unexhausted issues. Without specifying the basis for dismissal of each claim, the Kentucky Supreme Court refused to consider the unexhausted issues on one of two grounds: (1) that it had previously denied the issue in *Haight IV*, or (2) that Haight had failed to raise it in his initial state collateral proceeding. *Haight v. Commonwealth*, No. 2006-SC-000344-MR, 2007 WL 2404494 (Ky. Aug. 23, 2007) ("*Haight V*"). Haight returned to federal court and successfully moved to have the two now-exhausted issues included in his amended § 2254 petition. His habeas petition raised forty-five grounds for relief.

When Haight returned to federal court in 2008, his petition was referred to a new magistrate judge for a Report and Recommendation. Haight filed a detailed motion and application for the appointment of experts pursuant to 18 U.S.C. § 3599(f). The magistrate judge denied the motion, and the district court upheld the denial. Haight moved for discovery and an evidentiary hearing, both of which were also denied by the magistrate judge. Haight's objections were overruled by the district court. *Haight v. White*, No. 3:02-CV-206-GNS, 2013 WL 5146200 (W.D. Ky. Sept. 12, 2013). Two years later, the magistrate judge recommended the habeas petition be denied. *Haight v. Parker*, No. 3:02-CV-206-GNS, 2015 WL 13548182 (W.D. Ky. July 17, 2015). Over Haight's objections, the district court adopted the Report and Recommendation, denied the petition for relief, and certified twenty-five issues for appeal. *Haight v. White*, No. 3:02-CV-206-GNS, 2017 WL 3584218 (W.D. Ky. Aug. 18, 2017). Haight appealed to our court and moved to certify ten additional issues for review. We granted the request as to one additional issue concerning the jury instruction on the defense of extreme emotional disturbance.[1] *Haight v. Hart*, No. 17-6095 (6th Cir. Aug. 22, 2019).

II.

We review the district court's dismissal of a § 2254(d) petition de novo and its factual findings for clear error. *Lovins v. Parker*, 712 F.3d 283, 293 (6th Cir. 2013). Under § 2254(d), the district court "shall not [ ] grant[ ] [a habeas petition] with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . .; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

---

[1]In his appellate briefing, Haight appears not to pursue three of the issues certified by the district court. These are Ground 9 (failure to strike jurors and misadvising jurors) and Grounds 29 and 30 (impermissible funneling of jurors' discretion through the order of jury instructions). Even if language in Haight's 354-page brief arguably raises any of these issues, none of them provides a sufficient basis for reversing the district court.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 413. "As a condition for obtaining habeas corpus from a federal court, [the petitioner] must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), is a "purposefully demanding standard," *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (en banc), and it requires that state court determinations "be given the benefit of the doubt," *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

When the state court denies a petitioner's federal claim, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99–100. If the state court does not adjudicate a petitioner's claim on the merits, we review the claim de novo. *Cone v. Bell*, 556 U.S. 449, 472 (2009).

Haight raises many claims relating to his trial counsel's ineffective assistance. To establish ineffective assistance of counsel, Haight must show that his counsel provided deficient performance and that the deficient performance prejudiced his defense so as to render the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Focusing on the performance prong, the Supreme Court explained "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. The reviewing court's scrutiny of counsel's performance is deferential; "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must "eliminate the distorting effects of hindsight" and should review the reasonableness of

counsel's performance within the context of the circumstances at the time of the alleged errors. *Id.* at 689–90. To satisfy the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

AEDPA adds an additional layer of review. It requires us to evaluate whether the Kentucky Supreme Court's resolution of Haight's ineffective assistance of counsel claims was "contrary to, or involved an unreasonable application of, clearly established Federal law," § 2254(d)(1), or whether it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). *See Bell v. Cone*, 535 U.S. 685, 693–94 (2002). There is a "strong presumption" that counsel's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). When this presumption is combined with the deference required by § 2254(d), we must be "doubly deferential" to the state court's ruling on counsel's performance. *See Pinholster*, 563 U.S. at 190. However, if the state court "relied only on one Strickland prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the Strickland prong not relied upon by the state court," and that prong receives de novo review. *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

III.

A. Issue 1: Whether trial counsel rendered ineffective assistance by not moving to strike juror Gaugh for cause (Ground 5)

During voir dire, juror Gaugh stated he would not consider Haight's deprived background as mitigation evidence in the sentencing phase of trial. Haight argues that trial counsel's failure to strike Gaugh for cause constitutes ineffective assistance. Haight raised this claim in his state postconviction petition, the denial of which was affirmed by the Kentucky Supreme Court. *Haight IV*, 41 S.W.3d at 446.

Haight argues AEDPA deference should not apply to this claim because the state court did not decide this issue on the merits, and we agree. On direct appeal from his convictions and death sentence, Haight challenged the seating of several jurors, including Gaugh. But Haight acknowledged that he had not preserved an objection as to Gaugh, and the Kentucky Supreme Court rejected the claim as to all jurors:

> [Haight] has raised questions concerning jurors Hansen, Ireland, Huffman, Nestmann and Gaugh. . . . This Court has carefully considered each of these claims of error and determined that as to each, there was no preservation of the question or that the ruling was within the sound discretion of the trial court.

*Haight III*, 938 S.W.2d at 247.

Haight raised a claim of ineffective assistance in his state postconviction motion to vacate, arguing that counsel rendered ineffective assistance by not using peremptory challenges on three jurors, including Gaugh. Haight again cited Gaugh's refusal to consider the potentially mitigating evidence of his troubled background. Haight also asserted that he told counsel he wanted Gaugh removed from the jury. In denying this claim, the Kentucky Supreme Court stated: "The questions relating to [Gaugh] were rejected on direct appeal by this Court . . . when it held that the defense decision to reject objections to the juror was legitimate trial strategy." *Haight IV*, 41 S.W.3d at 446 (citation omitted). But *Haight III* did not address trial counsel's performance in failing to excuse Gaugh, nor was there a determination that this performance constituted legitimate trial strategy. As there is "reason to think" Haight's claim was rejected on a procedural ground and the Kentucky Supreme Court erroneously concluded it had already rejected the claim on the merits, AEDPA deference is not warranted. *Richter*, 562 U.S. at 99–100; *Cone*, 556 U.S. at 472.

We review Haight's ineffective assistance of counsel claim de novo. During voir dire, Gaugh agreed that he would "listen to all the evidence" and "consider and give effect to any sentence" he thought was appropriate within the range of twenty years to death. DE 188-2, Tr., Page ID 4043–44. Gaugh also agreed to consider and give effect to "mitigating circumstances . . . that might tend to lower the appropriate penalty," including if the "defendant was under the influence of extreme emotional disturbance" or "under the influence of alcohol." *Id.* at 4047–50. But Gaugh expressly stated he would not consider evidence related to a defendant's "deprived

home or background." *Id.* at 4049. Gaugh said he had no personal experiences with people from such backgrounds, but he also stated that he was "[s]ympathetic somewhat" to people from those backgrounds. *Id.* at 4054. After briefly questioning Gaugh, the prosecutor requested Haight "be required to waive an objection for cause" to Gaugh. *Id.* at 4055–56. Counsel waived the objection, noting that they "move to strike when we think it's appropriate" and they made "tactical decisions about each of" the jurors. *Id.* at 4056–57.

Under the Sixth Amendment, a criminal defendant has a right to trial by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726–27 (1992); *Hodges v. Colson*, 727 F.3d 517, 528 (6th Cir. 2013) ("*Morgan* allows for the identification and exclusion of jurors who are biased for or against the death penalty before being presented with any evidence and would *always* vote in accordance with their biases without regard to the particular facts of the particular case."). A jury that includes a "juror who will automatically vote for the death penalty in every case" violates a defendant's right to an impartial jury. *Morgan*, 504 U.S. at 729. Defendants "may challenge for cause any prospective juror who maintains such views." *Id.*

Haight must show that Gaugh was "actually biased against him." *Holder v. Palmer*, 588 F.3d 328, 339 (6th Cir. 2009). Actual bias in this context is "the existence of a state of mind that leads to an inference that the person will not act with impartiality." *Id.* at 339–40 (quoting *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001)). "A juror's express doubt as to [his] own impartiality" is insufficient for a finding of actual bias as "[t]he Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on *voir dire*." *Id.* at 339 (citation omitted). We consider "the totality of the juror's statements" in "assessing whether a juror was actually biased against a defendant." *Id.* at 340. In a capital punishment case, a juror is actually biased if he would "automatically vote for the death penalty in every case" or if he would "in no case . . . vote for capital punishment." *Morgan*, 504 U.S. at 728–29. We note that "[c]ounsel is . . . accorded particular deference when conducting *voir dire*. An attorney's actions during *voir dire* are considered to be matters of trial strategy." *Hughes*, 258 F.3d at 457.

Gaugh was not actually biased because he did not state that he would automatically vote for or against the death penalty. Gaugh indicated that he would fully consider and give effect to

mitigating evidence, including Haight's defenses of alcoholism and extreme emotional disturbance, and acknowledged that he had some sympathy for Haight's background. While Gaugh did express an unwillingness to consider mitigating evidence of Haight's personal history, we consider Gaugh's responses to voir dire questioning as a whole. *See Holder*, 588 F.3d at 340. Considering the totality of Gaugh's statements, there is no indication he would act with partiality.

Since Haight cannot establish that Gaugh was actually biased against him, he cannot establish his trial counsel's performance was objectively unreasonable. *See id.* at 339; *Strickland*, 466 U.S. at 688. The fact that Haight's counsel indicated he made a strategic decision not to strike Gaugh bolsters our conclusion. Haight has not overcome the presumption that counsel's decision was "sound trial strategy." *Strickland*, 466 U.S. at 689 (citation omitted). Because Haight cannot establish that trial counsel's performance was deficient, his ineffective assistance claim as to juror Gaugh fails.

B. Issue 2:      Whether trial counsel rendered ineffective assistance by not exercising peremptory strikes on three jurors (Ground 8)

Haight argues that he received ineffective assistance of counsel when his trial attorneys failed to honor his request to remove certain jurors by use of peremptory strikes. Haight contends that three jurors were biased against him: (1) Gaugh, for the reasons discussed in III.A; (2) Charles Helton, because he was robbed at gunpoint when he owned a jewelry store; and (3) Deborah Nichols, because her father was a Louisville police officer.[2] The Kentucky Supreme Court denied Haight's claim on the merits, *see Haight IV*, 41 S.W.3d at 443–44, so we review its decision under AEDPA.

Haight argues that his counsel rendered deficient performance when they allegedly refused to exercise Haight's peremptory strikes in accordance with his wishes. Haight, however, utilized the full number of peremptory challenges available to him under state law. *Haight IV*, 41 S.W.3d at 443. He devotes considerable effort to arguing that the exercise of peremptory challenges is a substantial right in Kentucky but does not explain how his "counsel's

---

[2]Haight's claims based on these jurors' possession of prejudicial information are discussed at III.P.

representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Haight's assertions do not overcome the strong presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

Haight also cannot establish prejudice. He fails to show a reasonable probability that the result of his proceeding would have been different if the three jurors had been removed. *See id.* at 694. He argues that Gaugh was actually biased against him, but this argument fails for the reasons discussed above. *See supra* Section III.A. Haight does not allege that Helton or Nichols were actually biased against him, and we see no evidence that they would "automatically vote for the death penalty." *Morgan*, 504 U.S. at 729.

Haight utilized the full number of peremptory challenges provided to him by state law. His counsel did not render ineffective assistance by failing to utilize his peremptory challenges in the manner he requested. *See Hughes*, 258 F.3d at 457 ("Counsel is . . . accorded particular deference when conducting *voir dire*."). The Kentucky Supreme Court did not unreasonably apply *Strickland* to this claim.

C. Issue 3:     Whether trial counsel rendered ineffective assistance by failing to adequately investigate and present mitigation evidence (Ground 13)

Haight alleges that trial counsel was constitutionally ineffective at the penalty phase for failing to adequately investigate and request experts to present evidence of organic brain damage. This claim stems from counsel's failure to seek a neurological evaluation after discovering a 1974 psychological evaluation ("1974 Report") that discussed potential limitations in Haight's intellectual capacity.

The Kentucky Supreme Court rejected Haight's ineffective assistance as to mitigation claim in *Haight IV*:

> This Court has recognized the necessity for complete investigation by defense counsel. We must agree with the view expressed by the United States Supreme Court in *Strickland*, *supra*, to the effect that counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary under all the circumstances and applying a heavy measure of deference to the judgment of counsel. A reasonable investigation is not an investigation that the best criminal defense lawyer in the world, blessed not

only with unlimited time and resources, but also with the benefit of hindsight, would conduct. *Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998). The investigation must be reasonable under all the circumstances. *Stevens v. Zant*, 968 F.2d 1076 (11th Cir. 1992).

Haight now complains that trial counsel was ineffective and deficient in not seeking expert assistance to evaluate his mental status and psychological makeup as early as possible in preparation for trial. In December of 1985, trial counsel filed a motion for funds for expert witnesses and for an ex parte hearing. The trial judge heard arguments and overruled the motions but granted leave to the defense to establish a need for experts. A month later, the defense made a request for a continuance, stating that it could not make requests for experts until after discovery was completed.

Here, Haight maintains that the need for neuropsychological evaluation and psychopharmacologist evaluation should have been obvious to defense counsel. He asserts that although counsel may have been prevented from expending funds for expert witnesses between May 8, 1991, until *Haight v. Williamson*, *supra*, was decided on May 14, 1992, counsel was not prevented from otherwise investigating and preparing the case.

On direct appeal, Haight made a claim that he was improperly denied the expert assistance of a neuropsychologist which was rejected when his conviction was affirmed.

The clinical forensic psychologist who examined Haight in preparation for trial, specifically found no evidence that Haight was psychotic or suffered from any serious neurological deficit or was otherwise retarded. This expert testified during the penalty phase of the trial. Here, as in his direct appeal, Haight is creating an issue based on the same brief references and reports from the mid-1970s which mentioned a possibility of brain damage but did not make such a finding.

The right to funding for expert psychiatric assistance only arises when a defendant's mental state is "seriously in question." *Hunter v. Commonwealth, Ky.*, 869 S.W.2d 719, 722 (1994), quoting *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L.Ed.2d 53 (1985). Defense counsel was not ineffective for relying on the opinion of an expert he obtained who determined that Haight had no significant neurological deficit. *See Walls v. Bowersox*, 151 F.3d 827 (8th Cir. 1998). Trial counsel is required only to conduct a reasonable investigation. *Mahaffey v. Page*, 151 F.3d 671 (7th Cir. 1998).

In this case, there is no reasonable probability that the omitted evaluations would have changed the result reached by the jury or the sentencing fixed by it. He was not prejudiced by the alleged failure of trial counsel to investigate and present defense and mitigating evidence. There is no showing of either deficient

performance or substantial prejudice which are required to present an ineffectiveness of counsel argument.

41 S.W.3d at 446–47.

First, we must determine whether AEDPA deference applies. AEDPA's deferential standard of review only applies to claims that were "adjudicated *on the merits* in State court proceedings." 28 U.S.C. § 2254(d) (emphasis added). We "begin by asking which is the last *explained* state-court judgment" on the habeas claim under consideration. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *see also Richter*, 562 U.S. at 97–99. Here, the Kentucky Supreme Court last addressed Haight's ineffective assistance claim in *Haight IV*, holding that Haight's trial counsel was not constitutionally ineffective as "[t]here [was] no showing of either deficient performance or substantial prejudice." 41 S.W.3d at 447. There is no indication that this finding was based on a procedural rule, so we must presume it was adjudicated on the merits. *See Richter*, 562 U.S. at 99. This "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99–100. Haight does not make such a showing. In the district court, Haight acknowledged that the Kentucky Supreme Court denied this ineffective assistance claim on the merits. DE 119-1, Mot., Page ID 1472 ("The Kentucky Supreme Court then denied [Ground 13's] claims on the merits, finding 'no showing of either deficient performance or substantial prejudice which are required to present an ineffectiveness of counsel argument.'" (citing *Haight IV*, 41 S.W.3d at 447)). Additionally, Haight did not challenge the magistrate judge's finding that *Haight IV* decided the ineffective assistance at mitigation claim on the merits nor does he challenge the district court's adoption of that finding on appeal. But Haight argues AEDPA should not apply because the Kentucky Supreme Court "failed to engage with the facts relevant to this issue and misapplied the law." CA6 R. 41, Appellant Br., at 98–99. He does not, however, assert that *Haight IV* was not on the merits.

We note that the Kentucky Supreme Court referred to Haight's claim on direct appeal that "he was improperly denied the expert assistance of a neuropsychologist," but it did not base its ineffective assistance decision on this direct appeal finding. *Haight IV*, 41 S.W.3d at 446–47. This distinction is important because, at the time, Kentucky prohibited postconviction ineffective

assistance claims where the alleged underlying error by counsel was adjudicated on direct appeal. *Sanborn v. Commonwealth*, 975 S.W.2d 905, 909 (Ky. 1998).[3] The state trial court, in postconviction proceedings, appeared to follow *Sanborn* in denying Haight's motions for discovery and appointment of experts because all alleged issues "were or should have been raised" on direct appeal. But the Kentucky Supreme Court in *Haight IV* addressed the merits of the ineffective assistance at mitigation claim and did not treat *Sanborn* as a procedural bar.

Nowhere in *Haight IV* is there any indication that the Kentucky Supreme Court rejected Haight's ineffective assistance at mitigation claim based on a procedural bar.[4] Moreover, its analysis, which sets out the *Strickland* standard and applies it to the facts of Haight's case, does not provide a "reason to think some other explanation for the state court's decision is more likely" than an adjudication on the merits. *Richter*, 562 U.S. at 99–100. For the foregoing reasons, AEDPA's deferential standard of review applies.

Second, we must consider whether Haight has established a constitutional violation and whether the Kentucky Supreme Court unreasonably applied federal law to this claim. *See Williams*, 529 U.S. at 399; *Cone*, 535 U.S. at 693–94; *Caudill v. Conover*, 881 F.3d 454, 460 (6th Cir. 2018) (holding that, for petitioner to prevail on her ineffective assistance claim, "[s]he must establish a Sixth (and Fourteenth) Amendment violation—that her lawyers performed well below the norm of competence in the profession and that this failing prejudiced her . . . [a]nd she must satisfy AEDPA—by showing that any rulings by the state courts on the merits . . . were unreasonable"). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law," and "a federal habeas court may not issue the writ simply because that court concludes . . . that the relevant state-court decision applied clearly established federal

---

[3]Notably, *Haight IV* itself was later overruled in part because "appellate resolution of an alleged direct error cannot serve as a procedural bar to a related claim of ineffective assistance of counsel" in postconviction proceedings. *Leonard v. Commonwealth*, 279 S.W.3d 151, 158 (Ky. 2009). But *Haight IV*'s holding on the ineffective assistance at mitigation claim does not conflict with *Leonard* because it does not rely on the direct appeal as a procedural bar to postconviction relief and directly addressed the merits of the ineffective assistance of counsel at mitigation claim.

[4]The Kentucky Supreme Court's analysis of Haight's ineffective assistance at mitigation claim is distinguishable from claims it did reject as procedurally barred due to alleged direct error below in accordance with *Sanborn*. For example, the court rejected Haight's claim that "trial counsel was ineffective by not requesting that a 'No adverse inference' instruction relating to [his] right to remain silent be given at the penalty phase" as not properly before it because the claim "was an issue on direct appeal of the case." *Haight IV*, 41 S.W.3d at 448.

law erroneously or incorrectly." *Williams*, 529 U.S. at 410–11 (emphasis in original); *see also Mills v. Cason*, 572 F.3d 246, 250 (6th Cir. 2009).

To evaluate the performance prong of Haight's ineffective assistance at mitigation claim, "it is best to begin with the evidence . . . actually presented in mitigation." *Lorraine v. Coyle*, 291 F.3d 416, 427 (6th Cir. 2002). Counsel hired Carol Good, a social work professor, who testified during the penalty phase of the trial. Good reviewed Haight's background, including his school, mental health, and institutional histories. She interviewed Haight and several family members. Good described the neglect and abuse suffered by Haight as "among the worst situations" she had ever evaluated in her twenty-eight years of experience. DE 188-11, Tr., Page ID 4695. Good testified that Haight's parents had a tumultuous marriage, which included domestic violence towards each other and their children. Social workers concluded that the parents were unable to raise their children properly and made records of inconsistent childcare, supervision, and food. Haight was placed in a juvenile home when he was six years old, then he was shuttled between juvenile homes, foster care, and his mother's house. Haight was sexually abused during childhood. His IQ scores decreased from age six to age thirteen, which is a sign of serious emotional trauma. Haight was examined by a psychologist when he was fourteen, and the psychologist noted that Haight's behavior was impulsive and that he had difficulty exercising appropriate judgment. By the time he was a teenager, Haight began abusing drugs. He married at sixteen and divorced at seventeen. Good concluded that the chronic and extreme neglect, periodic abuse, violence, and lack of supervision led to the development of a person who was an unpredictable teenager, had little understanding of structure and limits, and lacked the ability to control himself or appreciate the difference between right and wrong.

Counsel also retained Dr. Brad Fisher, a clinical forensic psychologist, and Fisher also testified during the penalty phase. Fisher interviewed Haight twice and extensively reviewed his personal and family history. Fisher noted that Haight was evaluated by a clinical psychologist when he was fourteen, and the psychologist reported that, due to "a chaotic, abusive, neglectful family" life, Haight suffered from feelings of worthlessness and inferiority, behavior problems, poor judgment, and impulsive behaviors. DE 188-12, Tr., Page ID 4722–24. Haight also suffered from attention deficit disorder or hyperactivity. After two interviews with Haight when

he was forty-one years old, Fisher's primary findings were consistent with the psychological evaluation from his teenage years. As a result of Haight's chaotic background, Fisher found that Haight suffered from a fear of rejection, failed to develop appropriate decisionmaking and problem-solving skills, and experienced confusion under stress. Fisher opined that Haight was emotionally and mentally disturbed at the time of the murders, describing his emotions as "totally out of control" and stating he was unable to exercise appropriate decisionmaking. *Id*. at 4731. Fisher also opined that Haight was not psychotic, did not suffer from any serious neurological deficits, and was not intellectually disabled.

Counsel also called two of Haight's family members to testify during sentencing. Lana Walker, Haight's half-sister, described Haight's father as "abusive, hateful, [and] mean" and said he was someone who "hurt everyone in his path." DE 188-10, Tr., Page ID 4561. Haight's father regularly beat Haight and his mother, and family members feared him. Their home was filthy with garbage lying around. As Haight and his brothers grew older, they resorted to theft to feed themselves. Betty Smith, Haight's mother, also testified. She described her marriage to Haight's father as abusive, "[w]orse than anything [she] can sit here and describe." *Id*. at 4582. She described an incident in which he knocked her down a flight of stairs while pregnant, causing her to miscarry, and another in which he slammed her head against a wall until she was unconscious. Smith was hospitalized for mental health issues on more than one occasion.

Additionally, Haight testified in his own defense during the guilt phase, and his testimony included mitigating evidence. *Bell*, 535 U.S. at 699–700; *Harper v. Commonwealth*, 978 S.W.2d 311, 317 (Ky. 1998) (In Kentucky, "[w]hen the same jury sits in both parts of a bifurcated proceeding in a capital murder trial, all evidence introduced in the guilt phase may be considered by the jury during the sentencing phase."). Haight noted that he and his brothers were removed from his family's home when he was three and placed in a children's home. Haight lived there for many years and also spent time in foster homes. After he turned twelve, he returned to his mother's custody. Despite returning home, Haight frequently ran away. He resorted to stealing food and clothes out of necessity and started drinking alcohol when he was twelve. Haight dropped out of school at age sixteen as an eighth grader. By the time he was eighteen, Haight was serving his first time in prison.

Despite this presentation of mitigating evidence, Haight asserts trial counsel's performance was deficient for numerous reasons. Haight faults his counsel for not retaining the services of Good and Fisher until approximately a month before trial. But counsel was not allowed to access expert funding until the Kentucky Supreme Court decided *Haight II*, which could have rendered funding moot.[5] Further delay then resulted when the first expert who agreed to evaluate Haight unexpectedly declined.

Haight also argues that counsel did not timely discover the 1974 Report. The 1974 Report noted Haight's early drug abuse, discussed potential limitations in his intellectual capacity, and observed he may have "some cortical dysfunction." CA6 R. 35-5, 1974 Report, Page ID 254. His "[p]sychological testing and social history support an impression that there is a possibility of brain damage." *Id*. at 255. An affidavit from the Department of Public Advocacy's senior investigator explains that she began attempting to obtain this report in mid-November 1993, but she did not receive a copy until January 22, 1994, after the trial had begun. Counsel did not share this report with Fisher or move for neurological testing of Haight while the trial was ongoing. In a motion for a new trial, counsel requested funds to hire an expert to conduct a complete neuropsychological evaluation of Haight, but the court denied the motion. While Haight faults counsel for not discovering this evidence sooner, the record reflects that counsel began investigating potential mitigating evidence months before trial and obtained the 1974 Report only after considerable effort. Further, before trial, Haight was evaluated by Fisher, who did not suggest that Haight needed neurological testing and repeatedly asserted that Haight was not intellectually disabled. It is "not unreasonable" for counsel, "untrained in the field of mental health," to rely on the professional opinions of expert witnesses. *Clark v. Mitchell*, 425 F.3d 270, 285 (6th Cir. 2005). Although "the Supreme Court has held that a criminal defendant is entitled to the assistance of a competent psychiatrist if the defendant can demonstrate that his sanity will be a significant issue at trial," it "has never stated as a per se rule

---

[5]*Haight II*, issued on May 14, 1992, held Haight was not entitled to specific performance of the Commonwealth's recommendation of a life sentence from the previous plea proceeding. 883 S.W.2d at 824. If Haight had prevailed in *Haight II*, he would have pled guilty and received a life sentence without the possibility of parole for twenty-five years—thereby obviating the need to present mitigation evidence.

that a particular type of mental health expert is required in death penalty cases." *Carter v. Mitchell*, 443 F.3d 517, 526 (6th Cir. 2006) (citing *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)).[6]

Haight also argues that counsel was deficient in failing to further investigate and present evidence concerning his substance abuse. But Good and Fisher testified about Haight's substance abuse, and Haight also discussed it in his testimony during the guilt phase. Counsel's failure to hire a substance abuse expert usually does not constitute ineffective assistance if the evidence would have been cumulative to that provided by other experts and would not have changed the result. *Otte v. Houk*, 654 F.3d 594, 602 (6th Cir. 2011).

Haight's arguments on delay and potential additional evidence do not show constitutionally deficient performance where counsel investigated and presented evidence regarding Haight's mental health, alcohol and drug abuse, and family background. The Kentucky Supreme Court's holding that Haight's trial counsel was not ineffective was not unreasonable or contrary to federal law.

Even if counsel's performance was deficient, Haight must demonstrate that this deficiency prejudiced his case. Haight must show a reasonable probability exists that, without the errors, at least one juror "would conclude that the balance of aggravating and mitigating circumstances did not warrant death." *Wheeler v. Simpson*, 852 F.3d 509, 515–16 (6th Cir.

---

[6]The dissent agrees with Haight's position that trial counsel failed to timely investigate his background and failed to timely use the 1974 report once it was discovered. The cases cited by the dissent in support of this position, however, involve much more egregious conduct than that of Haight's counsel. In *Rompilla v. Beard*, counsel failed to investigate the court file from the defendant's prior conviction despite notice that the prosecution intended to seek the death penalty by proving the defendant had a significant history of felony convictions involving violence. 545 U.S. 374, 383 (2005). In *Wiggins v. Smith*, counsel conducted a cursory review of the defendant's background and made only a passing reference to their client's "difficult life" during sentencing because they instead elected to focus on re-litigating the extent of their client's involvement in the crime. 539 U.S. 510, 514–15 (2003). Haight's counsel, in contrast, went to considerable effort to investigate Haight's background and present mitigation evidence. Counsel introduced evidence of Haight's dysfunctional upbringing and history of substance abuse. Counsel obtained expert witnesses who provided favorable reports and who testified for the defense. And although the dissent believes that counsel should have recognized a need for neurological testing given Haight's background, Fisher had examined Haight and concluded that he was not intellectually disabled and did not need additional testing. Counsel is generally not considered ineffective for failing to independently discover the need to order neurological testing after an expert opines that there is no need. *Clark*, 425 F.3d at 286. Counsel was similarly "not required to continue looking for experts just because the one [counsel] had consulted gave an unfavorable opinion." *Walls*, 151 F.3d at 836 (internal quotation marks omitted). Thus, we conclude that the Kentucky Supreme Court did not unreasonably apply federal law in determining that counsel conducted an adequate investigation and that counsel's decision to prioritize other evidence over the 1974 report was reasonable.

2017) (quoting *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005)); *see also Andrus v. Texas*, 140 S. Ct. 1875, 1885–86 (2020); *Wiggins v. Smith*, 539 U.S. 510, 534–37 (2003); *Wong v. Belmontes*, 558 U.S. 15, 19 (2009); *Porter v. McCollum*, 558 U.S. 30, 40 (2009). Conversely, the defendant fails to show prejudice if the new evidence would not significantly alter the sentencing profile, would be cumulative, or would not differ in a substantial way from the evidence presented. *Sears v. Upton*, 561 U.S. 945, 954 (2010); *Bobby v. Van Hook*, 558 U.S. 4, 11–13 (2009); *Caudill*, 881 F.3d at 462–64.

Haight maintains he was prejudiced because counsel failed to develop and present evidence that he suffered from organic brain damage and alcoholism. But Haight has not presented sufficient evidence supporting these claims. For his allegation that he suffers from organic brain damage, Haight relies on declarations from Dr. George Woods, a neuropsychiatrist, and Dr. Myla Young, a neuropsychologist. Based on their review of the available records concerning Haight's personal and medical history, both opined that Haight has signs of organic brain impairment and recommended further neurological testing. For his argument about his history of alcoholism, Haight relies on a declaration from Dr. David Benjamin, a psychopharmacologist, who opined that Haight's lengthy history of substance abuse impacted his ability to self-control and reinforced schizophrenic psychotic breaks from reality. Haight, however, presented these declarations for the first time in federal court. As discussed above, because AEDPA review applies to this claim, our review is limited to the record that was available to the state courts, and we cannot consider these declarations in determining whether Haight has demonstrated prejudice. *Pinholster*, 563 U.S. at 185; *Carter v. Bogan*, 900 F.3d 754, 776, 779 (6th Cir. 2018).

Counsel presented a strong case for mitigation on Haight's behalf, even though it was ultimately unsuccessful. The witnesses during the sentencing phase testified that Haight experienced a devastatingly dysfunctional and abusive childhood—bouncing between family members, foster care, and juvenile institutions, and not receiving adequate care, support, or discipline. This upbringing resulted in impaired judgment and a lack of critical thinking skills. The jury also heard evidence regarding Haight's substance abuse. While additional evidence that Haight suffered a brain injury would have provided further support for his mitigation case,

Haight has not shown this evidence would be sufficiently compelling to result in a noncapital sentence when weighing all the evidence presented at sentencing. The Kentucky Supreme Court did not unreasonably apply federal law and therefore the district court did not err in dismissing Haight's ineffective assistance at mitigation claim.

D. Issue 4:      Whether the trial court erred in refusing to permit the defense to have Haight examined by a neuropsychologist before sentencing (Ground 31)

Haight first argues that the trial court's refusal to permit an expert in brain damage or neuropsychology to evaluate him after the 1974 Report came to light was error and hindered his due process right to present nonstatutory mitigating evidence. Haight claims that his three new experts will prove that his brain damage is "not hypothetical," but we review the record from the perspective of the Kentucky Supreme Court at the time of its decision. *Pinholster*, 563 U.S. at 185. The facts before the Kentucky Supreme Court were as follows: the trial court was presented with the 1974 Report that gave "an impression that there is a possibility of brain damage," and Fisher testified that, according to his "clinical impression," there was "no indication that [Haight] is psychotic, suffers from serious neurological deficits, or is in any way retarded." CA6 R. 35-5, 1974 Report, Page ID 255; DE 188-12, Tr., Page ID 4741. Haight did not argue that Fisher was unqualified, and the trial court gave weight to the testimony of Haight's own expert. In light of Fisher's testimony, the Kentucky Supreme Court did not unreasonably apply federal law by concluding that the trial court did not err in refusing a further examination.

Haight also argues that the trial court's refusal to grant him funds to hire a neuropsychologist violated his due process right to access a psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, in violation of *Ake v. Oklahoma*, 470 U.S. 68, 70 (1985). But this argument is before us for the first time on appeal. In state court, Haight only argued that the trial court's refusal to allow a neuropsychological evaluation was effectively a refusal to consider relevant mitigation evidence. *Haight III*, 938 S.W.2d at 249. Haight raised the same singular argument in the district court. *Haight*, 2017 WL 3584218, at *41–42. Because the state court never considered this new argument, it is unexhausted, and we may not consider it here.

E. Issue 5:    Whether the district court improperly denied Haight's request for the appointment of medical experts

Haight asserts that the district court erred in denying his request to appoint Dr. Woods, Dr. Young, and Dr. Benjamin to evaluate and assist him during the federal habeas proceedings. We review the district court's decision for an abuse of discretion. *Foley v. White*, 835 F.3d 561, 563 (6th Cir. 2016). Under 18 U.S.C. § 3599(f), the district court may authorize the payment of expert services if reasonably necessary for the representation of the habeas petitioner. The district court must determine "whether a reasonable attorney would regard the services as sufficiently important." *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018). In considering the "reasonably necessary" standard, courts must "consider the potential merit of the claims that the applicant wants to pursue, the likelihood that the services will generate useful and admissible evidence, and the prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Id.* at 1094. While the "reasonably necessary" test requires an assessment of the likely utility of the requested services, the habeas petitioner is not "expected to *prove* that he will be able to win relief if given" those services. *Id.* (emphasis in original).

"Along with his ex parte motion, Haight included the initial evaluation results obtained by the three proposed experts following their review of his existing records." *Haight*, 2015 WL 13548182, at *70 n.27. Although the district court did not have the benefit of the Supreme Court decision in *Ayestas* when deciding Haight's request, it considered the appropriate factors under § 3599(f) and found the appointment of these experts was not reasonably necessary because they were not likely to generate useful information concerning the merits of Haight's ineffective assistance claim. *See id*. Even though all three proposed experts' declarations found indications of organic brain damage, the Kentucky Supreme Court's conclusion that counsel's performance was not deficient was a reasonable application of federal law. The new information that Haight hopes to learn from his proposed experts would only go to *Strickland*'s prejudice inquiry and would not impact the state court's conclusion regarding the performance prong. Therefore, any new evidence would not change the result for this issue.

F. Issue 6:      Whether trial counsel rendered ineffective assistance by not moving to admit the 1986 plea agreement (Ground 16)

Haight argues that his trial counsel rendered ineffective assistance by not introducing his rejected agreement with the prosecution to plead guilty in exchange for a life sentence. The Kentucky Supreme Court addressed this issue in *Haight IV*, noting a "split of authority" as to whether a criminal defendant has a right to introduce evidence of a withdrawn guilty plea as mitigation evidence in a capital trial. 41 S.W.3d at 447–48. The court concluded that counsel's performance was not deficient because no relevant authority clearly established Haight's right to introduce this evidence. *Id.* at 448. This court has held that a capital defendant has no right to present evidence of a willingness to accept a guilty plea in exchange for a life sentence during his mitigation case. *See Wright v. Bell*, 619 F.3d 586, 598–601 (6th Cir. 2010); *Owens v. Guida*, 549 F.3d 399, 419–22 (6th Cir. 2008). Here, we must defer to the Kentucky Supreme Court's opinion. Given the law's ambiguity on this issue, we cannot say that the state court unreasonably applied federal law.

G. Issue 7:      Whether trial counsel rendered ineffective assistance by not moving to admit the Jeanne Omer letter (Ground 6)

Haight argues that, during the sentencing phase, his trial counsel should have introduced a letter from Haight to Jeanne Omer, the sister of one of his victims. In the letter, Haight expresses deep remorse and sorrow for his crime and hopes that Omer can forgive him. While remorse is an appropriate mitigating factor, the jury heard directly from Haight about his remorse when he testified during the guilt phase. When asked how he "fe[lt] about killing two innocent people," Haight told the jury he did not "like it a bit and wish[ed] that [he] could redo it—or give [his] life for it . . . it's not right." DE 188-7, Tr., Page ID 4364–65. In the letter, Haight expressed the same feelings by writing that a death sentence would be an appropriate penalty and one that he might welcome: "If you think I should pay with my life then I'd have to agree with you." CA6 R. 35-6, Ltr., Page ID 117. He wrote: "I have to face the fact that I'll be caged the rest of my life or most of it. Would death be easier? At times I feel it would be." *Id.*

The Kentucky Supreme Court affirmed the denial of this claim in *Haight IV*, concluding that defense counsel did not wish to "reemphasize Haight's guilt phase testimony to the jury"

during mitigation.  41 S.W.3d at 448.  This was not an unreasonable application of federal law.  First, because evidence of Haight's remorse had already been presented, trial counsel was not ineffective for failing to present cumulative evidence of his remorse.  *Niels v. Bradshaw*, 482 F.3d 442, 459 (6th Cir. 2007).  Second, Haight twice acknowledged in his letter that death would be an appropriate penalty.  Counsel could have decided that the potential harm from these statements outweighed any benefit from presenting cumulative evidence of remorse.  Haight presents no evidence to counter the presumption that failing to introduce the letter during the penalty phase was trial strategy, so we reject Haight's ineffective assistance of counsel claim.

H. Issue 8:     Whether the jury instruction on manslaughter violated due process
               (Ground 26)

Haight argues that a due process violation occurred because the jury instruction in the guilt phase for first-degree manslaughter improperly required Haight to demonstrate that he was suffering from an extreme emotional disturbance.[7]  Under Kentucky law, if the defendant offers evidence at trial that he was suffering from extreme emotional disturbance, it is the Commonwealth's burden to prove the absence of extreme emotional disturbance beyond a reasonable doubt in order to convict the defendant of murder.[8]  The crime of manslaughter does

---

[7]Instruction No. 4, First Degree Manslaughter, was read to the jury as follows:

If you do not find the defendant . . . guilty of Murder under Instruction No. 3, you will find the defendant guilty of First Degree Manslaughter under this instruction if you believe from the evidence beyond a reasonable doubt all of the following:

> A.  That . . . [defendant] killed David Omer by shooting him with a gun;
>
> AND
>
> B.  That in so doing, he intended to cause the death of David Omer, and was acting under the influence of extreme emotional disturbance.

App'x Vol. 4, at A1584.  An identical instruction was given as to victim Patricia Vance in Instruction No. 2.

[8]Instruction No. 3, Murder, was read to the jury as follows:

You will find the defendant . . . guilty of Murder under this Instruction if you believe from the evidence beyond a reasonable doubt all of the following:

> A.  That . . . [defendant] killed David Omer by shooting him with a gun;
>
> AND
>
> B.  That in so doing, he intended to cause the death of David Omer, and he was not acting under the influence of extreme emotional disturbance.

App'x Vol. 4, at 1583. An identical instruction was given as to victim Patricia Vance in Instruction No. 1.

not require any finding on the presence or absence of extreme emotional disturbance. *See Elery v. Commonwealth*, 368 S.W.3d 78, 91–93 (Ky. 2012). "The best way to address the issue is to include [extreme emotional disturbance] in the murder instruction and make no mention of it in the manslaughter instruction." *Id.* at 92. The manslaughter instruction tendered by Haight, which was not adopted by the trial court, accordingly omitted any reference to extreme emotional disturbance, but the court instead required extreme emotional disturbance in the manslaughter instruction. The Kentucky Supreme Court rejected Haight's argument on the merits, holding that any error in the manslaughter instruction was harmless. *Haight III*, 938 S.W.2d at 248–49.

The Warden concedes that the manslaughter instruction was erroneous because it should have been silent as to extreme emotional disturbance. Warden's Br. at 76. But the fact that a jury instruction was incorrect under state law does not necessarily warrant habeas relief—there must be a federal constitutional violation. *Estelle v. McGuire,* 502 U.S. 62, 71–72 (1991). Generally, a jury instruction that shifts or relieves the prosecution of its burden of proof violates due process. *See In re Winship*, 397 U.S. 358, 364 (1970). For example, in *Sandstrom v. Montana*, 442 U.S. 510 (1970), the Supreme Court held that a jury instruction that eliminates or shifts a state's burden to prove every element of an alleged crime beyond a reasonable doubt violates the defendant's due process rights. *See id*. at 524. However, we must also look at the challenged instruction within the context of the overall instructions. *See Estelle,* 502 U.S. at 72. Here, the instructions as a whole did not shift the burden of proof. The jury was instructed that under the evidence presented, it could find Haight (1) not guilty; (2) guilty of murder as set out in Instructions Nos. 1 and 3; or (3) guilty of First-Degree Manslaughter as set out in Instructions Nos. 2 and 4. App'x Vol. 4, at A1579. The trial court instructed that the jury could not find the defendant guilty of murder unless it found beyond a reasonable doubt that Haight was not acting under the influence of extreme emotional disturbance. In addition, Instruction No. 8, Presumption of Innocence, instructed the jury that if it had a reasonable doubt as to guilt, it must find Haight not guilty, and if it had a "reasonable doubt as to the degree of the offense, you shall find him guilty of the lower degree. Murder is the higher degree. Manslaughter First Degree is the lower degree." App'x Vol. 4, at A1588. The instructions, when taken as a whole, did not impermissibly shift the burden of proof.

In any event, the error here was harmless. The Warden contends that any error was harmless because the additional requirement in the manslaughter instruction *increased* the burden on the Commonwealth to prove either the presence or the absence of extreme emotional disturbance beyond a reasonable doubt for both murder and manslaughter instead of only murder. Furthermore, the Warden contends, the jury found Haight guilty of murder and thus found the absence of extreme emotional disturbance, so any error in the manslaughter instruction was harmless. Viewed through the lens of AEDPA, the Kentucky Supreme Court did not unreasonably apply federal law when it found that any error in the manslaughter instruction was harmless. Erroneous jury instructions will only warrant federal habeas relief if they were "so infirm that they rendered the entire trial fundamentally unfair." *Austin v. Bell*, 126 F.3d 843, 846 (6th Cir. 1997). The state court concluded that Haight was not prejudiced by any error in the manslaughter instruction given at his trial, and he has not shown that conclusion to be contrary to or an unreasonable application of any Supreme Court precedent.

I. Issue 9:    Whether appellate counsel rendered ineffective assistance of counsel for failing to challenge the trial court's refusal to give a jury instruction on the lesser-included offense of theft (Ground 43)

At trial, Haight requested an instruction on theft as a lesser-included-offense to first-degree robbery based on his testimony during the guilt phase that he did not intend to rob Omer or Vance. The trial court denied the request. Although preserved, Haight's appellate counsel did not raise the issue on direct appeal. Haight did not raise an ineffective assistance of appellate counsel claim ("IAAC"), but later raised it in his amended petition. He withdrew the claim from his amended petition, acknowledging that then-current Kentucky law did not recognize, and the state courts would not adjudicate, claims of IAAC. *See, e.g., Parrish v. Commonwealth*, 272 S.W.3d 161, 173–74 (Ky. 2008).[9] Haight raised his IAAC claim in his habeas petition, but both the magistrate judge and the district court found the claim procedurally defaulted because he had not raised it in his state postconviction petition. *Haight*, 2017 WL 3584218, at \*46–47; *Haight*, 2015 WL 13548182, at \*136–39.

---

[9]The Kentucky Supreme Court later overruled this line of cases and recognized that an attorney's failure to raise a meritorious issue on appeal may constitute ineffective assistance of counsel. *Hollon v. Commonwealth*, 334 S.W.3d 431, 434–37 (Ky. 2010).

Contrary to the district court's conclusion, the claim is not procedurally defaulted. Even before *Hollon*, when the Kentucky courts did not provide an avenue for raising an IAAC claim, we considered such claims from Kentucky habeas petitioners on the merits. *Boykin v. Webb*, 541 F.3d 638, 647–48 (6th Cir. 2008). Likewise, we reviewed the merits of an IAAC claim from a Kentucky habeas petitioner even though the petitioner never raised the claim in the Kentucky state courts due to the state precedent at the time that prevented the adjudication of such claims. *Halvorsen v. White*, 746 F. App'x 489, 494 (6th Cir. 2018). Based on this precedent, Haight was not required to make the futile gesture of presenting a claim to state courts that would not recognize the claim, and his failure to do so does not preclude federal habeas review.

Because the Kentucky state courts never reviewed the IAAC claim, AEDPA deference does not apply to the claim, and we review it de novo. However, even under de novo review, the claim fails. Appellant counsel is not required to raise every non-frivolous claim. *See, e.g., Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003). To prevail on a claim of IAAC, petitioner must show that the omitted claim was stronger than the issues actually raised. *Smith v. Robbins*, 528 U.S. 259, 288–89 (2000); *Caver*, 349 F.3d at 348. To obtain habeas relief for failure to instruct the jury, Haight must show that the failure "so infected the entire trial that the resulting conviction violates due process," *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)), rendering the trial fundamentally unfair.

Haight has not shown that the failure to give an instruction on theft rendered his whole trial unfair. Although he testified that he did not intend to take the victims' property, he does not contest that he shot them and had their property in his possession. Under similar circumstances, Kentucky courts have upheld the discretion of trial courts to refuse to give a defense-tendered instruction on theft. *See Sanders v. Commonwealth*, 301 S.W.3d 497, 500–01 (Ky. 2010); *Nutter v. Commonwealth*, No. 2006-SC-000234-MR, 2008 WL 1850595, at *2 (Ky. Apr. 24, 2008); *Cobb v. Commonwealth*, No. 2002-SC-0052-MR, 2003 WL 21990530, at *5 (Ky. Aug. 22, 2003). In addition, the aggravator for multiple intentional murders remained even if the murder-in-the-course-of-robbery aggravator were eliminated, so Haight would still be death eligible regardless of whether the requested theft instruction was given. While he spends much time in his brief explaining how the removal of the robbery aggravator could have changed his entire

trial, such an outcome was highly unlikely. In light of the evidence presented at trial, and the case law on the issue, appellate counsel cannot be found ineffective for failing to pursue this claim on appeal when other, stronger issues were raised.

J. Issue 10:  Whether trial and appellate counsel rendered ineffective assistance regarding the lack of a jury instruction on wanton murder (Ground 44)

Haight seeks relief due to the failure of trial counsel to tender an instruction on wanton murder as an alternative to intentional murder.[10] According to Haight, a conviction of wanton murder, which he contends does not contain an intent element under Kentucky law, would have eliminated one of two aggravating circumstances and he potentially could have avoided the death penalty. *See* Ky. Rev. Stat. § 532.025. The district court found the claim procedurally defaulted because Haight did not present it to the Kentucky state courts. *Haight*, 2017 WL 3584218, at *47. Haight does not dispute the procedural default finding, but instead contends that the ineffective assistance of his postconviction counsel excuses the default. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012). In *Martinez*, the Supreme Court held that ineffective assistance of counsel during the initial postconviction collateral proceedings can establish cause to excuse a procedural default. *Id*. at 17. In *Trevino v. Thaler*, 569 U.S. 413 (2013), the Court interpreted *Martinez* to hold that a federal habeas court can find cause to excuse a procedural default where: (1) the ineffective assistance of trial counsel claim was "substantial," (2) the petitioner lacked counsel or counsel was ineffective during the postconviction proceeding, (3) the state postconviction proceeding was the first opportunity for petitioner to raise an ineffective assistance of trial counsel claim, and (4) state law requires that the ineffective assistance of trial counsel ("IATC") claim must be raised in the initial postconviction proceeding and generally cannot be raised on direct appeal. *Id*. at 423. We have held that the *Martinez/Trevino* exception may excuse procedural default of IATC claims in Kentucky state court. *Woolbright v. Crews*, 791 F.3d 628, 636 (6th Cir. 2015).

---

[10]Haight also claims IAAC in not presenting the instruction issue on direct appeal and ineffective assistance of postconviction counsel in failing to raise the issue in the initial RCr 11.42 motion. Even if these claims are cognizable, our holding that Haight's trial counsel was not ineffective on this issue precludes any finding that appellate and postconviction counsel could be ineffective for failing to raise the underlying claim regarding the wanton murder jury instructions.

Haight cannot excuse the procedural default here, however, due to his failure to show that the claim is "substantial." Haight's counsel had a strategic reason for not requesting a wanton murder charge, because wanton murder is not a lesser-included offense of intentional murder, but instead is another form of committing murder. *See* Ky. Rev. Stat. § 507.020(b); *Ratliff v. Commonwealth*, 194 S.W.3d 258, 275 (Ky. 2006) (quoting *Foster v. Commonwealth*, 827 S.W.2d 670, 677–78 (Ky. 1991)). Both intentional murder and wanton murder are capital offenses, meaning Haight still would have potentially faced the death penalty if convicted of wanton murder. *See* Ky. Rev. Stat. § 507.020(2).[11] Trial counsel pursued a defense of extreme emotional disturbance, which was a reasonable strategy under the circumstances. They also requested and received an alternative instruction for the lesser-included offense of manslaughter, which is not a capital offense. Haight has not demonstrated that counsel's failure to pursue a wanton murder instruction, when a wanton murder conviction would not have allowed him to escape the death penalty, was unreasonable.

K. Issue 11: Whether trial counsel rendered ineffective assistance by not requesting a "no adverse inference" instruction (Ground 15)

Haight claims his trial counsel was ineffective for failing to request a "no-adverse-inference" instruction relating to his right to remain silent during the penalty phase. Haight testified at the guilt phase of his trial, but not at the penalty phase. The Kentucky Supreme Court in *Haight IV* resolved the matter as follows:

---

[11]Indeed, the Kentucky murder statute can fairly be read to *include* the wanton conduct described in Ky. Rev. Stat. § 507.020(b) within the intent crime defined in Ky. Rev. Stat. § 507.020(1)(a), rather than adding a different crime. *Ward v. Commonwealth*, 695 S.W.2d 404 (Ky. 2013), relied upon repeatedly by Haight in this context, when carefully read, is fully consistent with such a reading. The Kentucky statute provides that a person is guilty of murder when:

(a) With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. However, nothing contained in this section shall constitute a defense to a prosecution for or preclude a conviction of manslaughter in the first degree or any other crime; or

(b) *including*, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

Ky. Rev. Stat. § 507.020 (emphasis added).

Haight complains that trial counsel was ineffective by not requesting that a "No adverse inference" instruction relating to the defendant's right to remain silent be given at the penalty phase. Haight testified at the guilt phase of this trial, but he did not testify during the penalty phase. His counsel did not tender a "No adverse inference" instruction, did not request such an instruction or object to the failure of the court to give one. He asserts that it was incumbent upon the trial judge to instruct the jury that the defendant did not have an obligation to testify in mitigation and no adverse [inference] could be drawn from his failure to do so.

This claim does not amount to ineffective assistance of counsel. The allegation is not properly presented on [t]his appeal because it was an issue on direct appeal of the case. Haight did testify during the guilt phase of his trial and admitted killing the two victims. *Carter v. Kentucky*, 450 U.S. 288 (1981), is not applicable.

*Haight IV*, 41 S.W.3d at 448 (parallel citations omitted). We agree with Haight that the Kentucky Supreme Court made a factual error when it said that the no-adverse-inference instruction was an issue on direct appeal. But Haight did raise an IATC claim relating to the failure to request a no-adverse-inference instruction in postconviction proceedings. As discussed above, at the time of Haight's direct appeal and postconviction proceedings, Kentucky courts did not recognize IATC claims in postconviction proceedings if the underlying claim had been rejected on direct appeal. It appears likely that the Kentucky Supreme Court erroneously believed it had rejected the underlying no-adverse-instruction claim on direct appeal. That error notwithstanding, and although admittedly not a model of clarity, the Kentucky Supreme Court reached the merits of the IATC claim based on its statement that "[t]his claim does not amount to ineffective assistance of counsel" followed by its observation that *Carter* is not applicable because it holds that a no-adverse-inference instruction is required only at the guilt phase.

Haight's trial counsel did not render deficient performance because it was a reasonable strategy not to remind the jury of Haight's highly damaging guilt phase admission to the murders by requesting a no adverse inference instruction at the penalty phase. "Judicial scrutiny of counsel's performance must be highly deferential," and there is a presumption that "the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quotation omitted). Trial counsel's choice here could be classified as a reasonable strategic choice. Trial counsel may have chosen to limit the damaging impact of Haight's guilt phase testimony by keeping references to it from the jury when possible. The jury was concerned enough about that damaging testimony to request to hear it again during the penalty phase—a

request that was denied. A no-adverse-inference instruction in the penalty phase would merely have reminded the jury that Haight did testify, much to his own detriment, during the guilt phase of the trial. Trial counsel's evaluation of the situation was accordingly reasonable. This claim is accordingly without merit under *Strickland* regardless of whether we review the issue de novo or apply AEDPA deference to the Kentucky Supreme Court's holding.

L. Issue 12:   Whether the trial court improperly excluded jurors who were not substantially impaired in considering death as a sentence (Ground 19)

Haight argues that the trial court improperly excluded jurors Hansen and Ireland for cause after it erroneously concluded that they would not consider the death penalty. The Kentucky Supreme Court dismissed this claim along with other alleged jury selection issues, stating: "[A]ppellant has raised questions concerning jurors Hansen [and] Ireland . . . This Court has carefully considered each of these claims of error and determined that as to each, there was no preservation of the question or that the ruling was within the sound discretion of the trial court." *Haight III*, 938 S.W.2d at 247. Although the exact basis for the Kentucky Supreme Court's denial of this claim is unclear, AEDPA deference still applies. When a state court denies relief on a federal claim, we presume "the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (quoting *Richter*, 562 U.S. at 99). Haight provides no basis for overcoming this presumption.

During voir dire, Hansen stated multiple times she was morally opposed to the death penalty. After further questioning from the trial court and each party, she stated that she "might seriously consider it, but then [she would] probably reject it." DE 188-4, Tr., Page ID 4144. When asked whether she could "seriously consider the whole range of penalties," Hansen answered no. *Id.* at 4148. The trial court determined that "her ability to consider the whole range of penalty [was] seriously impaired" and excused her from service. *Id.* at 4150. Ireland stated he did not believe in the death penalty. While he at one point said he would try to consider death as a penalty, he also definitively stated he could not consider it under any circumstances. The trial court also excused Ireland from service.

In *Uttecht v. Brown*, 551 U.S. 1, 9 (2007), the Supreme Court articulated the "principles of relevance" for considering whether excluding a juror for cause based on opposition to the death penalty is appropriate. It stated:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. . . . Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. . . . Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. . . . Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment, a judgment owed deference by reviewing courts.

*Id*. at 9 (citations omitted).

Despite some hesitation on close questioning, both jurors ultimately stated they could not seriously consider the death penalty regardless of the evidence presented. To the extent that any ambiguity existed in the jurors' testimony, it is within the province of the trial court to resolve it. *Bryan v. Bobby*, 843 F.3d 1099, 1109 (6th Cir. 2016). The trial court elected to excuse them, and "[d]eference to the trial court is appropriate." *Uttecht*, 551 U.S. at 9. The Kentucky Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.

M. Issue 13: Whether the trial court failed to exclude jurors who were substantially impaired in considering and giving effect to mitigation evidence (Ground 20)

Haight contends that jurors Huffman, Nestmann, and Gaugh were not constitutionally qualified to sit as jurors in his capital case. All three jurors stated that they would not consider Haight's background as mitigating evidence. The Kentucky Supreme Court considered this claim with the other jury issues, concluding that there was no preservation of the claim or that it was within the trial court's discretion. *Haight III*, 938 S.W.2d at 247. For the same reasons as above, *see supra* Section III.L (applying AEDPA deference to Issue 12), we review this claim under AEDPA.

Any juror not willing to consider mitigating evidence should be disqualified for cause. *Morgan*, 504 U.S. at 739. In *Morgan*, the Court stated "[a]ny juror to whom mitigating factors are . . . irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id*. The primary concern expressed in *Morgan* is a juror who would automatically recommend death regardless of any mitigating evidence. *Id*. at 738–39.

Gaugh's alleged refusal to consider mitigating evidence was discussed at length above in connection with Haight's ineffective assistance claim regarding the failure to request removal of Gaugh for cause. *See supra* Section III.A. In this claim, however, Haight alleges that the *trial court* erred by not removing Gaugh for cause. For the reasons previously discussed, Haight's claim that Gaugh should have been removed for cause is without merit.

Haight removed Huffman from the venire with a peremptory challenge. When a "defendant elects to cure" the trial court's failure to dismiss a juror for cause "by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right." *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000). Claims that the jury was not impartial must focus on the jurors who ultimately sat on the jury, not on those dismissed through peremptory challenges. *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). Haight's claim therefore fails as to Huffman.

Nestmann acknowledged during voir dire that he would have difficulty considering certain categories of mitigating evidence, but ultimately agreed that he would seriously consider all the mitigating evidence in the case. Nestmann stated that his "job as a juror is to listen to . . . and try to accept" all evidence. DE 188-2, Tr., Page ID 4090. Haight does not argue that Nestmann was actually biased against him, and we see no evidence suggesting Nestmann would "automatically vote for the death penalty." *Morgan*, 504 U.S. at 729.

N. Issue 14:  Whether an alternate juror associated with the victims' families
              (Ground 21)

Haight argues that the jury was improperly affected by the presence of alternate juror Donohue who, after being excused from the jury following the guilt phase, sat in the courtroom

near the victims' families during the penalty phase. It is undisputed that Donohue did not talk or have direct contact with these families. Yet, Haight maintains that Donohue was exhibiting silent support for the families, which could have influenced the jury during the sentencing proceedings. The Supreme Court has never found the conduct of a private actor in the courtroom "so inherently prejudicial that it deprived a defendant of a fair trial." *Carey v. Musladin*, 549 U.S. 70, 76 (2006). Given the lack of Supreme Court precedent regarding the potentially prejudicial effect of spectators' courtroom conduct, the Kentucky Supreme Court's opinion denying this claim was not an unreasonable application of clearly established federal law. *See id.* at 77.

O. Issue 15:  Whether trial counsel rendered ineffective assistance by failing to make a
            record and move for mistrial regarding a sleeping juror (Ground 14)

The record reflects that Haight's trial counsel mentioned some of the jurors had been sleeping during the penalty phase to the trial judge during a bench conference at the conclusion of his mitigation presentation. Haight argues that trial counsel rendered ineffective assistance by not making an adequate record identifying the allegedly sleeping jurors, by not providing the trial court with any details concerning when or how long the jurors had been asleep, and by not moving for a mistrial or requesting other relief. Consequently, the trial court took no action, and the alleged error was not preserved for direct review on appeal under Kentucky law.

Haight raised this claim in his state postconviction petition. He did not identify which jurors were sleeping, when they were sleeping, what information they missed, or how it would have changed the outcome of his trial. *Haight IV*, 41 S.W.3d at 447. The Kentucky Supreme Court therefore concluded that Haight failed to plead sufficient facts under Kentucky Rule of Criminal Procedure ("RCr") 11.42(2) to state a Sixth Amendment claim for ineffective assistance of counsel under *Strickland*. Kentucky law uniformly holds that a criminal defendant seeking postconviction relief by way of Kentucky Rule of Criminal Procedure 11.42 may not rely on vague allegations without offering specific facts to support his or her claims of ineffective assistance. *See, e.g., Foley v. Commonwealth*, 17 S.W.3d 878, 884, 888 (Ky. 2000), *overruled on other grounds by Stopher v. Conliffe*, 170 S.W.3d 307 (Ky. 2005).

The district court agreed that Haight failed to provide any meaningful detail concerning the circumstances of the alleged sleeping jurors. It declined to reach the merits of the claim, agreeing with the magistrate judge's finding that it is procedurally defaulted for "fail[ure] to comply with a well-established, regularly followed rule of state procedure that was explicitly relied upon by the state's highest court to decline to reach the merits of this Sixth Amendment Claim." *Haight*, 2015 WL 13548182, at *78–80.

Even if this claim was not procedurally defaulted, it is without merit. We agree with the district court that if Haight had presented evidence supporting his claim that a juror was sleeping during the penalty phase of his trial, he still cannot show his counsel's performance was deficient. By mentioning to the trial judge that some jurors might be sleeping, but not objecting or otherwise asking the judge at that time for any corrective action, trial counsel's failure to act was likely tactical strategy, and thus not an objectively unreasonable performance under *Strickland*. *See, e.g.*, *Arispe v. United States*, No. 03-10124-BC, 2005 WL 3132211, at *2 (E.D. Mich. Nov. 21, 2005) ("It is not necessarily an unreasonable strategy for a defense attorney to decline to object to juror inattentiveness, especially when the jurors may have been inattentive to the government's case.").

We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Haight has not overcome the presumption in this circumstance that his trial counsel's actions "might be considered sound trial strategy." *Id*. (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Because counsel's performance was not deficient, Haight cannot establish ineffective assistance.

P. Issue 16:   Whether Haight's right to an impartial jury was violated when jurors who knew prejudicial facts sat on his jury (Ground 17)

Haight contends that three jurors were improperly influenced by extrajudicial information before jury selection, and that the trial court's failure to dismiss these jurors violated his due process rights. A local newspaper article reported that Haight previously pled guilty to the murders and was sentenced to death but that the sentence was overturned on appeal. It further stated that a police officer was accidentally shot to death by a Kentucky state trooper during Haight's arrest. This information was not admitted into evidence at trial. During voir dire, eight

jurors were excused after they acknowledged their exposure to the article. Haight raised this issue on direct appeal as to jurors Helton, Nichols, and Gaugh, and the Kentucky Supreme Court found it meritless. *Haight III*, 938 S.W.2d at 245–47.

During voir dire, Helton acknowledged that he read the newspaper article prior to reporting for jury duty, stating he vaguely remembered it. Helton claimed that he read only the headline, did not read anything regarding the history of the case, and did not discuss the article with anyone other than his wife. When the trial court judge asked him whether he had a fixed opinion about the case, given the details or facts he may have learned from the article, Helton answered no. He also agreed to consider all the evidence and the full range of punishments. Haight did not move to exclude Helton for cause, and no peremptory challenge was used to remove him. Helton was seated and participated in the verdict.

During the postconviction hearing, Helton stated that nothing from the article "would have swayed [his] decision one way or another." DE 188-14, Tr., Page ID 4919. The trial court specifically found that Helton "answered questions truthfully, both on voir dire, and at the [postconviction] hearing" and that he was credible and unbiased. DE 188-15, Tr., Page ID 4982–83. The court further stated, "[t]here was no deliberate concealment on his part, of information, which would compel this court to reach a conclusion that he was partial." *Id.* at 4983.

The Kentucky Supreme Court stated it could "hardly conceive of a circumstance in which greater deference should be granted to the findings of the trial court." *Haight III*, 938 S.W.2d at 246. Citing Kentucky precedent, the court explained that "exposure to newspaper accounts of trials in progress does not automatically require reversal," and it distinguished this instance from cases in which jurors deliberately concealed information revealing their bias and partiality. *Id.* (citations omitted). The court found no prejudice to Haight on account of Helton's service on the jury and upheld the trial court's ruling. *Id.*

During voir dire, Nichols stated she "heard that [the article] . . . was in the paper, but [she] did not hear what it was about." DE 188-3, Tr., Page ID 4112. Nichols stated that she would listen to all the evidence and consider all penalties. After the trial, Nichols stated to the

prosecutor that she knew a police officer had been killed. During Haight's postconviction hearing, when the judge asked Nichols how she knew that information, she claimed that Haight's counsel revealed the information during voir dire. The court clarified that Haight's counsel said the officer had been shot but did not say the officer had been killed. Nichols claimed she did not believe that Haight shot the officer and that the officer shooting was not discussed in the jury room. Nichols also stated that she was fair and impartial and considered only the evidence presented at trial. The Kentucky Supreme Court found that Haight's contentions with Nichols were "insubstantial." *Haight III*, 938 S.W.2d at 247. It found that Nichols "was given enough information during voir dire to have led to a mistaken belief on her part." *Id.* The court further found that Nichol's postconviction testimony was "without any hint of dishonesty." *Id.*

Gaugh was not questioned about the article during voir dire. During the postconviction hearing, the prosecutor testified that, after the trial, Gaugh and fellow juror Nestmann asked her if "something else" occurred in the cornfield that they were not allowed to hear during trial. DE 188-14, Tr., Page ID 4931. The prosecutor informed them a police officer had been killed. Gaugh did not indicate that he had any prior information about the officer's death. Haight's counsel argued that Gaugh could have been "expressing that there was information expended in the jury room that something else occurred in the cornfield" and asked for further testimony. *Id.* at 4932.

During the final sentencing hearing, Gaugh testified that he knew "during the trial that an officer had been killed." DE 188-15, Tr., Page ID 4957. Upon further questioning, Gaugh stated that he only knew the officer had been shot and that he did not know anything about the case other than the evidence presented at trial. Gaugh clarified that he first learned of the officer being killed when the prosecutor revealed the information after trial.

On direct appeal, Haight argued that Gaugh's postconviction testimony was "more than enough to compel the inference that Gaugh concealed vital information." *Haight III*, 938 S.W.2d at 247. The Kentucky Supreme Court found the evidence "ambiguous" and deferred to the trial court's conclusion that Gaugh "had no information which would cause the court to believe that [he was] in any way partial in [his] deliberations or [his] final conclusions." *Id.*

The Kentucky Supreme Court's denial of this claim was not an unreasonable application of federal law.  Once concerns of juror bias due to extrajudicial information were raised, the trial court held a hearing, and the court and counsel for both sides had an opportunity to explore any potential bias.  "[A] trial court's finding that a juror was impartial is entitled to a presumption of correctness, rebuttable only upon on a showing of clear and convincing evidence."  *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003).  Pretrial publicity itself, even when pervasive and adverse, "does not inevitably lead to an unfair trial," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976), and Haight has failed to demonstrate any jurors were actually biased.

Q. Issue 17:   Whether Haight's jury was unfairly selected (Ground 18)

Haight argues that he was denied due process and an impartial jury because the procedures used in his trial violated Kentucky rules for jury selection.  First, instead of qualifying thirty jurors as required by Kentucky Rule of Criminal Procedure 9.36(2), the trial court erroneously qualified thirty-two.  This resulted in seventeen jurors remaining after the exercise of peremptory challenges, instead of the fourteen needed to seat twelve jurors and two alternates.  Because the trial court permitted too many jurors to be qualified, the judge's clerk drew the names of three jurors to strike from the wheel containing the seventeen remaining jurors, rather than pulling the names of fourteen jurors to be seated as required by Rule 9.36.  The three jurors selected to be stricken were women, and one of the three was African-American.  After this second mistake, rather than continuing to draw an additional eleven names in addition to the three names already removed from the jury wheel, the trial judge directed his clerk to redraw the names of fourteen jurors.  When the clerk redrew fourteen names, in a highly unlikely occurrence, the same three female jurors were again excluded from sitting on the jury.

Haight first argues that the trial court's selection procedure violated his "right to a fair and impartial jury, including the right to a venire that represents a fair cross-section of the community."  CA6 R. 41, Appellant Br., at 283.  Citing *Batson v. Kentucky*, 476 U.S. 79 (1986), Haight claims "[t]he irregularities in the selection of the venire . . . resulted in an arbitrary exclusion of women and African-Americans" from his jury.  *Batson* objections, however, must be "made before the jury is sworn and the trial commences."  *United States v. Tomlinson*, 764 F.3d 535, 537 (6th Cir. 2014).  As Haight did not raise a *Batson* objection at trial, his claim

is not preserved. *Id.* Haight does not argue cause and prejudice to excuse his procedural default. *See Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc). Regardless, Haight has not provided evidence that the three women were excluded from the jury due to their race or gender, or that the empaneled jury did not represent a fair cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 538 (1975) ("The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community."). The Kentucky Supreme Court's holding was not an unreasonable application of clearly established federal law.

Haight next argues that the selection procedure was not random and claims "[s]omething improper happened." CA6 R. 41, Appellant Br., at 283. The Kentucky Supreme Court rejected this claim on the merits in *Haight III*, so we review Haight's arguments under AEDPA. The Kentucky Supreme Court found "no evidence upon which any impropriety may be inferred." 938 S.W.2d at 247. The court also found that the initial procedure utilized by the clerk was permitted by state procedural rules and that the redraw was "merely redundant." *Id.* The court held that the trial court substantially complied with jury selection rules and found "no error of sufficient gravity to overcome the trial court's discretion with respect to a new trial." *Id.* Although Haight frames his arguments in constitutional terms, he essentially argues that the trial court failed to follow state procedural rules in selecting the jury. The Kentucky Supreme Court found that the trial court complied with the relevant state rules. "[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). We affirm the district court's denial of this claim.

R. Issue 18:    Whether the trial court improperly refused to tell the jurors that their decision on mitigation did not have to be unanimous (Ground 27)

Haight argues that the trial judge failed to properly instruct the jury that each juror may individually determine, weigh, and consider evidence of mitigation, and that they did not all have to agree on the mitigators, thereby depriving Haight of a reliable verdict on punishment in violation of the Sixth, Eighth and Fourteenth Amendments.

First, the trial judge did not err by failing to instruct the jury that findings of mitigating circumstances do not need to be unanimous. The Supreme Court has determined that a

defendant's constitutional rights are not violated by the failure to give an instruction on mitigation unanimity, *Smith v. Spisak*, 558 U.S. 139, 148–49 (2010), and a state is not *required* to, although it may, adopt specific standards for instructing the jury in its consideration of mitigating factors under a death penalty scheme. *See Goff v. Bagley*, 601 F.3d 445, 461 (6th Cir. 2010) (citing *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998)). Kentucky has chosen not to require the trial judge to instruct the jury that its findings on the existence of any particular mitigating factor do not have to be unanimous. *See Bowling v. Commonwealth*, 873 S.W.2d 175, 180 (Ky. 1993) ("An instruction on unanimous findings on mitigation is not required. The instructions only require the jury to consider mitigating circumstances." (internal citation omitted)).

Second, the jury instructions did not create a substantial probability that the jury would believe its decision on mitigating factors had to be unanimous with respect to each factor. It is unconstitutional for a state to instruct jurors that they must unanimously agree on the existence of any mitigating factor, *Mills v. Maryland*, 486 U.S. 367, 384 (1988), and it is undisputed that the state did not do so here. However, jury instructions are still invalid if they create a "substantial probability" that reasonable jurors might think that they are precluded from considering any mitigating evidence unless jurors unanimously agree that the mitigator is proven. *See id*. In *Mills,* the Supreme Court vacated the conviction and remanded for further proceedings because the jury had received a verdict form which contained a list of possible mitigating circumstances, accompanied by spaces in which the jury could check "yes" or "no" and preceded by a statement that the jury "unanimously find[s] that each of the following mitigating circumstances which is marked 'yes' has been proven to exist." *Id*. at 384–89. The Supreme Court found that there was a "substantial probability that reasonable jurors . . . may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular" mitigating factor. *Id*. at 384.

The question, then, becomes whether there is a "substantial probability" that a reasonable juror would have thought that mitigating circumstances in Haight's case could not be considered unless the jury unanimously agreed that a particular mitigating circumstance existed. An answer in the affirmative would render the Kentucky Supreme Court's contrary decision an

unreasonable application of clearly established federal law. Haight's argument focuses on Instruction No. 5, entitled "UNANIMOUS VERDICT," which provided: "[e]ach verdict of the jury must be unanimous and be signed by one of you as foreperson. You may use the forms at the end of these instructions in writing your verdict." Haight argues that when Instruction No. 5 is read in conjunction with Instruction No. 3, which informed the jury that they shall consider mitigating evidence, it would cause a reasonable juror to believe that a finding of a mitigating factor by the jury must be unanimous. But in this case, unlike in *Mills*, the instructions did not explicitly refer to the issue of unanimity in the discussion of mitigating circumstances. Instruction No. 5 simply stated that the jury's verdict *itself* had to be unanimous, and nothing in the record suggests that the jurors were confused by these instructions. There is not a reasonable likelihood that a reasonable juror would have thought that she could not consider mitigating circumstances unless the jury unanimously agreed on that factor's presence. We rejected Haight's argument in *Wheeler v. Simpson*, 852 F.3d 509 (6th Cir. 2017), in which we held that the Kentucky Supreme Court did not unreasonably apply *Mills* when it affirmed a Kentucky trial court's instruction that the verdict must be unanimous in combination with the court's silence with respect to "unanimity as applied to mitigating factors." *Id.* at 519.

Haight's reliance on the Sixth Circuit decision in *Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003), is misplaced because Haight must point to Supreme Court, not Sixth Circuit, caselaw. To prevail on a habeas claim, the state court's decision must be contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1).

S. Issue 19:   Whether due process requires specific performance of the prosecution's written plea agreement (Ground 1), whether the prosecution was vindictive (Ground 2), whether the subsequent prosecution violated the Double Jeopardy Clause (Ground 3), whether the sentence was arbitrary, capricious, or discriminatory (Ground 4), and whether there was irrevocable prejudice (Ground 33)

As the parties do in their briefs, we group these grounds because they all relate to the fact that the initial trial court judge rejected Haight's plea agreement and sentenced him to death, and then after that guilty plea was vacated, the state was permitted to try him and obtain the death penalty.

1.  Due process and specific performance of the plea agreement (Ground 1)

Due process did not require the Kentucky courts to allow Haight to specifically enforce his plea agreement. While it is true that a criminal defendant has a due process right to enforce the terms of his plea agreement, *Santobello v. New York*, 404 U.S. 257, 261–62 (1971), when a promise on which a plea rests is not fulfilled, state courts are permitted to determine the remedy. *See id*. at 263. Here, the Kentucky Supreme Court held that the trial court had erred in sentencing Haight to death based upon a guilty plea pursuant to an agreement that the court rejected; the court then permitted Haight to withdraw his guilty plea and proceed to trial. Haight argues that the court should have directed specific performance of the plea agreement. However, states are not constitutionally required to provide specific enforcement of a plea agreement; they can instead remedy a plea agreement violation by allowing the defendant to withdraw the guilty plea. *See id*. at 262–63; *Mabry v. Johnson*, 467 U.S. 504, 511 n.11 (1984), *see also Puckett v. United States*, 556 U.S. 129, 137, 140 (2009). Indeed, the Supreme Court recently held that in the event of the breach of a plea agreement, "no decision from this Court clearly establishes that" a state court is required "to impose the lower sentence that the parties originally expected." *Kernan v. Cuero*, 138 S. Ct. 4, 6 (2017) (per curiam). The Kentucky Supreme Court thus reasonably applied federal law when it decided to permit Haight to withdraw his guilty plea and proceed to trial instead of mandating specific enforcement of the original agreement.

2.  Vindictive prosecution (Ground 2)

Haight also maintains that the prosecution's refusal to abide by the terms of the plea agreement after the Kentucky Supreme Court vacated his guilty plea reflected vindictive intent. A defendant may establish vindictive prosecution two ways. He can demonstrate "actual vindictiveness" by establishing through objective evidence that the prosecutor's actions were to punish the defendant for standing on his legal rights. *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001). Alternatively, the defendant may show that, in his particular situation, a "realistic likelihood of vindictiveness" existed for the prosecutor's action. *Id.* The court presumes an improper vindictive motive only when this reasonable likelihood of vindictiveness exists. *Id.* at 481–82. The defendant must establish that: (1) the prosecutor had "some stake" in

deterring the exercise of his rights; and (2) the prosecutor's conduct was somehow unreasonable. *Id.* at 482.

The Kentucky Supreme Court's rejection of this argument was a reasonable application of federal constitutional law. The court concluded that its decision to vacate Haight's guilty plea and reinstate the charges from the indictment reflected an understanding "that the Commonwealth might abandon the recommended sentence found within the plea agreement." *Haight II*, 833 S.W.2d at 824. Beyond his own speculation, Haight has not shown any evidence that the prosecutor's decision to pursue a death sentence on remand resulted from either actual vindictiveness or a reasonable likelihood of vindictiveness. Haight makes a conclusory argument that the prosecution still was obligated to follow the terms of the plea agreement once the Kentucky Supreme Court vacated his plea, but he presents no clearly established law in support of this argument that would render the Kentucky Supreme Court's decision unreasonable.

### 3. Double Jeopardy Clause (Ground 3)

Haight next asserts that the imposition of a death sentence following remand from the Kentucky Supreme Court violated his double jeopardy rights. However, it is well established that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent a government from retrying a defendant who is successful in getting his first conviction set aside, whether through direct appeal or collateral attack, because of some error in the proceedings leading to conviction. *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988); *Palazzolo v. Gorcyca*, 244 F.3d 512, 516 (6th Cir. 2001). Nonetheless, double jeopardy may bar imposition of the death penalty upon reconviction under certain circumstances if the initial conviction, subsequently set aside, had rejected a death sentence. *Arizona v. Rumsey*, 467 U.S. 203, 209 (1984); *Bullington v. Missouri*, 451 U.S. 430, 438 (1981). The relevant question is "not whether the defendant received a life sentence the first time around, but rather whether a first life sentence was an 'acquittal' based on findings sufficient to establish legal entitlement to the life sentence[.]" *Sattazahn v. Pennsylvania*, 537 U.S. 101, 108 (2003). In Haight's case, reimposition of the death penalty following his successful appeal did not constitute a double

jeopardy violation because no "acquittal" occurred in the original proceedings regarding the imposition of the death penalty. *See Mason v. Mitchell*, 729 F.3d 545, 552 (6th Cir. 2013).

Haight's circumstances do not fall within the exception to the general rule that permits the imposition of the death sentence upon retrial. Most importantly, Haight was never acquitted. In *Sattazahn, supra*, the Supreme Court held that the imposition of the death penalty did not violate the Double Jeopardy Clause when the jury sentenced the defendant to death after a retrial. The Court noted that although the first trial resulted in a hung jury on the death issue, and the judge accordingly imposed a life sentence, that sequence of proceedings did not amount to an acquittal. *See id.* at 109. The same is true here. Haight initially pled guilty and was sentenced to death. The sentencing decision was made by the trial judge, no jury was ever impaneled, and there was no finding that Haight was innocent or that there were a lack of mitigating circumstances. When the Kentucky Supreme Court vacated the death sentence and remanded for a retrial, the decision was based on the trial judge's failure to honor the plea agreement, not on any finding with respect to Haight's innocence.

Haight points out that Kentucky Rule of Criminal Procedure 9.84 requires a jury to decide the appropriate punishment in capital cases. There is no question that the trial judge at Haight's initial sentencing did not impanel a jury, but instead made the unilateral decision to sentence Haight to death. But any error in this decision was corrected in *Haight I* when Haight was allowed to withdraw his guilty plea. There is nothing to suggest that the state court decision was contrary to or an objectively unreasonable application of clearly established federal law to the facts of this case. Reasonable jurists could not disagree that the protections against double jeopardy do not apply to this case as Haight was never acquitted or sentenced to an earlier, lighter sentence by a jury.

4. Arbitrary, capricious, and discriminatory imposition of the death penalty (Ground 4)

Haight's death sentence did not involve the arbitrary application of the death penalty, vindictive prosecution, or irrevocable prejudice stemming from the disregarded guilty plea. Haight argues that he is "a class of one," and the legal and factual aberrations that led to his death sentence were therefore imposed arbitrarily and capriciously by definition. Haight

contends that a case like his has never occurred—either before 1986 or after. In the 10 years preceding Haight's guilty plea in 1986, 332 Kentucky defendants were "death eligible" but had their cases resolved through plea agreements. None of those defendants had their plea agreement disregarded and instead received a judicially imposed death sentence in contravention of the terms of the plea agreement and the prosecution's recommendation. Haight argues that there is no way to distinguish his case from those of the other death-eligible defendants in Kentucky who pled guilty with a plea agreement recommending a life sentence and who did in fact receive life sentences or other less-than-death sentences. Haight contends that "[n]o Kentucky prosecutor has ever had the opportunity to seek death on remand after recommending life." Appellant's Br. at 320. The original trial judge, who sentenced Haight death after refusing to honor the plea agreement, acknowledged that Haight's case was unique:

> You may be the only person ever treated differently . . . in light of literally hundreds and hundreds of murders [in Kentucky]. You may in fact be the only one sentenced according to my judgment here today.

App'x 2 at A0938. In fact, the unusual posture of Haight's case led to a change in the Kentucky Criminal Rules, which were amended to require the trial court to allow a defendant to withdraw his guilty plea if the trial court does not adopt the terms of the plea agreement and imposes a harsher sentence.

The arbitrary or discriminatory imposition of the death penalty can violate the Eighth or Fourteenth Amendments, but the fact that Haight's case is unique is not enough to establish a constitutional violation. The Supreme Court held that the death penalty "may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (citing *Furman v. Georgia*, 408 U.S. 238 (1976)). Consequently, a death penalty scheme must "provide a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Id.* (internal quotations omitted). Haight argues that the Kentucky Supreme Court's use of the very same words used by the Supreme Court in its Eighth Amendment jurisprudence, including terms such as "arbitrary" and "discriminatory," renders the Kentucky's Supreme Court's decision an unreasonable application of federal law. The Kentucky Supreme Court noted:

> In his brief and at oral argument, appellant has vehemently contended that the fact of his death sentence following his guilty plea has placed him in a class by himself due to the subsequent change in RCr 8.10 which permitted withdrawal of guilty pleas on failure of the court to approve the agreement. Again and again we have been bombarded with the words "arbitrary, freakish, discriminatory and disproportionate," terms which have little analytical force and serve only to elevate the decibel level of the discussion.

*Haight III*, 938 S.W.2d at 250.

We acknowledge that Haight may sense unfairness "in the air" stemming from the undeniably unique circumstances he faced, but Haight has not met the high bar required to demonstrate that the death penalty was applied in an arbitrary or discriminatory way here. First, Haight's initial death sentence was vacated, and the death penalty challenged here was imposed by a jury, which remedies any unfairness from the conduct of the first trial judge. Second, according to the Supreme Court, the fact that a defendant's case is statistically unique, or that other similar defendants did not receive the death penalty, is not enough to establish the arbitrary or discriminatory application of the death penalty. *See McCleskey v. Kemp*, 481 U.S. 279, 306–08 (1987). The Supreme Court has required only that a death penalty regime must "permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 174 (2006). That occurred here—at the penalty phase the jury heard mitigating evidence from a clinical psychologist, a social worker, and several members of Haight's family. The jury was instructed to consider mitigating evidence and had a full opportunity to examine Haight's entire background and record. In light of Supreme Court precedent and the jury's consideration of Haight's individualized situation, the unique nature of Haight's case alone is not sufficient to establish the arbitrary or discriminatory application of the death penalty.

5. Irrevocable prejudice (Ground 33)

As the last argument concerning his vacated guilty plea, Haight argues that he was unduly prejudiced by the delay from the time of his original plea in April 1986 to his trial in January 1994. He contends that two witnesses at trial had poor memories of the events underlying his

crimes due to the passage of time. Further, the delay prevented him from receiving a more timely psychological evaluation. In demonstrating a violation of his constitutional rights due to pre-trial delay, the defendant must demonstrate that he suffered substantial prejudice. *United States v. Schreane*, 331 F.3d 548, 557 (6th Cir. 2003). Potential prejudice includes the possibility that the defense will be impaired by "dimming memories and the loss of exculpatory evidence." *Doggett v. United States*, 505 U.S. 647, 654 (1992) (addressing prejudice in context of speedy trial claim); *Barker v. Wingo*, 407 U.S. 514, 532 (1972) (same). However, Haight's prejudice is largely speculative. He does not allege additional factual information forgotten by his witness that would have been pertinent to his defense. Nor has he demonstrated the manner in which a more timely psychological evaluation would have been valuable. Consequently, he has not shown substantial prejudice from the delay. Further, much of the delay was due to Haight's decision to seek enforcement of his original plea agreement. His unsuccessful pursuit of that enforcement postponed the trial proceedings several years.

Haight also argues that he was prejudiced by the media coverage concerning the plea agreement and the trial court's original decision to impose a death sentence. In order to address this concern, Haight's trial was transferred to another county. Further, several potential jurors were dismissed because they had read the *Louisville Courier-Journal* article about Haight's case. The trial court has wide discretion in conducting voir dire about pretrial publicity and other areas of inquiry that might tend to show juror bias. *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991); *Jackson v. Houk*, 687 F.3d 723, 733 (6th Cir. 2012). It is clear that the trial court actively attempted to obviate any potential prejudice to Haight from the prior proceedings in his case, and Haight has not shown that he suffered any prejudice.

T. Issue 20:   Whether Kentucky's death penalty scheme is facially unconstitutional (Ground 37)

Kentucky's death penalty statute is not facially unconstitutional. In affirming Haight's convictions and death sentence, the Kentucky Supreme Court rejected Haight's claims to the contrary:

> For his final claims of error, appellant has attacked various aspects of the Kentucky death penalty statute and asserted, among other things, that the Act is unconstitutional. We have answered appellant's contentions in this regard on

numerous occasions including *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665 (1990); *Smith v. Commonwealth*, Ky., 734 S.W.2d 437 (1987); and *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980). As such, we will not reiterate those discussions.

*Haight III*, 938 S.W.2d at 253. We have also rejected this argument. *McQueen v. Scroggy*, 99 F.3d 1302, 1333 (6th Cir. 1996), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004); *see also Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003). In granting a certificate of appealability on this issue, the district court relied on Justice Breyer's dissent in *Glossip v. Gross*, 576 U.S. 863, 909 (2015), which argued that all death penalty statutes involve "fundamental constitutional defects," including "serious unreliability," "arbitrariness in application," and "unconscionably long delays" that render them facially unconstitutional. But the Supreme Court has repeatedly emphasized that the death penalty is constitutional. *See, e.g., id.* at 89; *Baze v. Rees*, 553 U.S. 35, 47 (2008).

U. Issue 21:  Whether the district court abused its discretion in denying Haight discovery and an evidentiary hearing

The district court did not abuse its discretion when it denied Haight's requests for discovery and an evidentiary hearing relating to the issues of ineffective assistance of counsel, juror strikes, procedural default, the appointment of expert witnesses, and more. The Supreme Court held in *Cullen v. Pinholster*, 563 U.S. 170 (2011), that habeas review by a federal court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 180. As a result, "a district court cannot use a federal evidentiary hearing to supplement the record when assessing a claim under § 2254(d)." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020). Most of Haight's claims were adjudicated on the merits by the Kentucky courts, so no basis existed for the district court to order discovery or an evidentiary hearing.

With respect to the few claims that were not adjudicated on the merits in state court, Haight has failed to show that an evidentiary hearing was warranted. Among the claims on which Haight sought an evidentiary hearing, Grounds 14, 43, and 44 were not, or arguably were not, decided on the merits in state court. R.119, PID.1411. "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief . . . It follows that if the record

refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). That is the case here. Ground 14 is an IATC claim based on trial counsel's failure to object when jurors may have been sleeping during the penalty phase of the trial. As discussed above in Section III.O (which addressed Ground 14 on the merits), Haight cannot show IATC even if it is true that jurors were sleeping, so further factual development would not help Haight's case. In Ground 43, Haight asserts an IAAC claim stemming from appellate counsel's decision not to raise on direct appeal the trial court's refusal to instruct the jury on theft, which would be a lesser offense than first-degree robbery. Again, as explained above, Haight cannot show that appellate counsel was ineffective, and holding a hearing would not make Haight's claim more likely to succeed. Finally, further factual development on Ground 44 would not help Haight obtain habeas relief on that claim. Ground 44 is an IATC claim based on trial counsel's failure to tender an instruction on wanton murder. We previously explained that trial counsel was not ineffective for failing to tender that instruction because wanton murder is still a separate, death-eligible category of murder under Kentucky law. The district court thus did not abuse its discretion when it denied Haight an evidentiary hearing because such a hearing would have had no tendency to help Haight's claims.

The district court also did not abuse its discretion when it denied Haight's requests for discovery. "Habeas petitioners have no right to automatic discovery. A district court has discretion to grant discovery in a habeas case upon a fact specific showing of good cause." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). Haight requested discovery on many claims, and of them Grounds 5, 14, 43, and 44 were not, or arguably were not, decided on the merits. For the same reasons stated with respect to the request for an evidentiary hearing, discovery on Grounds 14, 43, and 44 would not have made Haight more likely to prevail, so the district court did not abuse its discretion when it concluded that Haight did not show good cause. The district court also did not abuse its discretion when it denied discovery on Ground 5, which alleged IATC based on counsel's failure to move to strike juror Gaugh for cause. As discussed above in Section III.A, Gaugh was not actually biased as a matter of law, so Haight cannot show that counsel's performance was objectively unreasonable. Conducting discovery would not change that outcome.

IV.

We affirm the district court's judgment dismissing Haight's habeas petition.

_____

**DISSENT**

_____

STRANCH, Circuit Judge, dissenting.  I concur in the majority opinion except Section III.C.  I respectfully dissent concerning Haight's claim in Ground 13 that counsel was ineffective at the penalty phase of trial for failing to investigate and request the appropriate experts in light of the abundant and readily available evidence that Haight likely suffered from brain damage. For the reasons below, I would grant relief and remand to the district court for further proceedings on Haight's claim that his trial counsel rendered deficient representation by failing to timely investigate and present evidence concerning Haight's likely brain damage, including counsel's failure to request and obtain an appropriate expert prior to the penalty phase of trial, thereby prejudicing Haight's chances of receiving a sentence less than death.

## I. *STRICKLAND* AND AEDPA

To establish a violation of the Sixth Amendment right to counsel, a defendant must demonstrate that counsel's representation was deficient and that it actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 692 (1984).  That standard requires Haight to establish "a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing," and "that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wiggins v. Smith*, 539 U.S. 510, 535, 536 (2003).  As the majority concedes, it takes only one juror to "conclude that the balance of aggravating and mitigating circumstances did not warrant death."  Maj. Op. at 17 (quoting *Wheeler v. Simpson*, 852 F.3d 509, 515-16 (6th Cir. 2017)).  Representation is deficient when it falls below an objective standard of reasonableness under prevailing professional norms.  *Strickland*, 466 U.S. at 688.  A petitioner must then show prejudice by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) requires habeas courts to evaluate whether the Kentucky Supreme Court's determination of Haight's ineffective-assistance-of-counsel-at-mitigation claim (IAC-Mitigation) was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or whether it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  There is a "strong presumption" that counsel's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689 (quotation omitted).  When this presumption is combined with the deference required by § 2254(d), the result is "double deference" to the state court's ruling on counsel's performance.  Double deference to a state court's adjudication of a *Strickland* claim applies only to *Strickland*'s performance prong, not to the prejudice inquiry.  Because I find deficient performance by trial counsel and prejudice resulting from that deficiency, I would hold that the Kentucky Supreme Court's decision to the contrary in *Haight v. Commonwealth*, 41 S.W.3d 436 (Ky. 2001) (*Haight IV*), was unreasonable under both subsections (d)(1) and (d)(2) of § 2254.

**A.  Deficient Performance under *Strickland***

1. Unreasonable Application of *Strickland* under § 2254(d)(1)

A defense attorney engaged in the representation of one accused of a crime has a well-established duty to "make reasonable investigations or to make a reasonable decision that make particular investigations unnecessary."  *Strickland*, 466 U.S. at 691; *see Cauthern v. Colson*, 736 F.3d 465, 485 (6th Cir. 2013) (discussing the failure of counsel to investigate potential mitigation evidence under *Wiggins* and *Strickland*).  The controlling inquiry in such instances is whether the decisions were objectively reasonable.  *Moore v. Mitchell*, 708 F.3d 760, 785 (6th Cir. 2013).

The state court record demonstrates that counsel's failure to timely investigate and seek an appropriate expert prior to trial who could diagnose and explain brain damage to the jury fell below prevailing professional norms.  Prior to trial, counsel failed to discover or to pursue

evidence from Haight's childhood and adolescence that showed Haight likely suffered from brain damage. Upon receiving the 1974 Report on January 22, 1994, during the guilt phase of the trial, trial counsel belatedly realized that Haight might suffer from brain damage, but counsel failed to act on this critical information in a timely manner. At the very least, trial counsel should have introduced information from the 1974 Report concerning possible brain damage to the jury during the mitigation phase through the two retained experts—Dr. Brad Fisher, a forensic psychologist, and Carol Good, a social worker. Or, counsel could have immediately requested postponement of the penalty phase to conduct further investigation based on the evidence of brain damage from the 1974 Report. Counsel did neither, and when they requested a new trial or postponement of sentencing after the trial ended to further investigate the 1974 report, it was too late. Neither request was granted, and no mention of possible brain damage was ever put in front of the jury.

It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase. At the time of Haight's trial in early 1994, counsel's failure to investigate and present evidence of a defendant's mental defect constituted deficient performance. The 1989 ABA Guidelines direct counsel in capital cases to "collect information relevant to the sentencing phase of trial including, but not limited to: medical history (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior) special educational needs (including cognitive limitations and learning disabilities)." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1(C), p. 93 (1989) (ABA Guidelines); *see also id*. at Guideline 11.4.1(d)(7), p. 16 (Counsel should secure the assistance of experts where it is necessary or appropriate for "the sentencing phase of the trial," and the "presentation of mitigation").[1] Also relevant, ABA criminal-representation standards at the time provided that "[i]nformation concerning the defendant's background, education, employment

---

[1]The ABA Guidelines look to prevailing professional norms and provide general guidance as to what is reasonable attorney performance; they are not rules or commands that demand strict compliance. *See Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides."); *see also Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam) ("Restatements of professional standards, we have recognized, can be useful as guides to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." (cleaned up)).

record, mental and emotional stability, family relationships and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions." ABA Standards for Criminal Justice, Standard 4-4.1 (1982 Supp.). Under the then-prevailing professional norms, counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing American Bar Association Standards for Criminal Justice 4–4.1, commentary, p.4–55 (2d ed 1980)); *accord Rompilla v. Beard*, 545 U.S. 374, 385-86 (2005).[2]

When evaluating counsel's performance, we must examine what counsel did (as well as what counsel did not do), and when he did it. In this case, we are not asked to decide whether counsel investigated—Haight's counsel did seek mental health assistance from two experts—instead we must peer into the adequacy of counsel's investigation. "In assessing counsel's performance, a court must thus consider whether counsel adequately followed up on the 'leads' that were available to them." *Haliym v. Mitchell*, 492 F.3d 680, 712 (6th Cir. 2007).

The Supreme Court has highlighted the importance of following evidence of possible brain damage in a defendant's past when evaluating the adequacy of counsel's investigation. In *Rompilla*, the Court held that a petitioner's trial counsel was deficient by failing to discover mitigating evidence, including evidence that Rompilla suffered from organic brain damage. 545 U.S. at 385-90. Rompilla's counsel, though on notice that the state would attempt to prove the defendant's history of violence by introducing his prior conviction for rape and assault, failed to examine the record of that conviction. *Id.* at 385-86. The Court emphasized that "[i]f the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up." *Id.* at 390. While the defense lawyers interviewed Rompilla and members of his family and consulted with three different mental health workers, their investigation failed to uncover any evidence of mental deficiency for use during the sentencing phase. Yet when the postconviction attorneys

---

[2]As seen from the Supreme Court's decisions in *Sears v. Upton*, 561 U.S. 945 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Williams v. Taylor*, 529 U.S. 362 (2000), the clearly established federal law and prevailing professional norms at the time of Haight's trial in 1994 required his trial counsel to conduct a thorough background investigation for mitigating evidence. The trials in those cases pre-date Haight's trial. Sears was tried in 1993, Porter in 1988, Rompilla in 1988, Wiggins in 1989, and Williams in 1986.

examined Rompilla's prison records, they "found plenty of 'red flags' pointing up a need to test further." *Id*. at 392. The Court determined that following these leads would have brought important mitigating evidence to light.

Like the deficiencies found in *Rompilla*, the "red flags" alerting counsel to possible brain damage in Haight's past included readily available documentation from Haight's childhood, such as medical and school records, and the results of various testing, such as IQ tests and other mental evaluations. Although counsel conducted some investigation, evidence of Haight's traumatic birth, head injuries in childhood and beyond, serious drug and alcohol abuse during adolescence, poor academic performance, and low IQ in available records was either not discovered or ignored, resulting in counsel's failure to hire a qualified expert to diagnose and explain the consequences of possible brain damage to the jury. Whether counsel failed to uncover these many "red flags" in Haight's background, or failed to see their significance, the result was the same: counsel missed numerous readily available indicators that Haight might have brain damage. A thorough investigation would have revealed the need for an expert with experience diagnosing and explaining brain damage well before the start of the guilt phase of Haight's trial. Instead, counsel hired a social worker and a forensic psychologist, missing the opportunity to hire appropriate experts, such as a neurologist, who could diagnose and explain the effects of possible brain damage to a jury. Identifying the "red flags" in Haight's history is not the result of 20-20 hindsight; the records indicating such damage were all available by the time of Haight's arrest in 1985, and a reasonable attorney in the late 1980s and early 1990s would have been alerted to the need for a neurological examination based on Haight's background alone, long before the 1974 Report surfaced during Haight's trial. Counsel's failure to investigate obvious sources of mitigating evidence, or to follow important leads they did uncover, constitutes deficient performance under *Strickland*.

The timing of counsel's investigation is also critical in evaluating whether performance was deficient. *See Williams*, 529 U.S. at 395. The 1989 ABA Guidelines state that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial[,]" and "[b]oth investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously." ABA Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(A), p. 13 (1989); *see also id.* at Guideline 11.8.3, p. 23 ("[P]reparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case."). Based on then-prevailing norms, a thorough investigation into Haight's mental health background should have been pursued well in advance of counsel's receipt of the 1974 Report on January 22, 1994. Counsel had almost eight years between Haight's arrest and trial to gather information from available sources such as schools, prisons, state agencies and the like, that should have been pursued even if a court order prevented counsel from hiring experts for several years.

Trial counsel's lack of timely investigation is also evident from the delay in retaining experts. Pretrial history of Haight's case shows that after an initial unsuccessful effort to obtain funds for an expert witness in December 1985, no further efforts were made until shortly before the January 1994 trial.[3] The record indicates that by September 1992 counsel was free to hire experts, but counsel delayed at least another year once funds became available from the courts. Carol Good, the social worker, was not rehired until November 1993, and Dr. Fisher, Haight's key mental-health expert, was not hired until mid-December 1993, less than one month before trial. Fisher met with Haight for the first time less than two weeks prior to trial, far too late for counsel to have the key mitigation witness begin work on the case.

Counsel also failed to timely utilize the valuable information contained in the 1974 Report concerning Haight's mental deficiencies, including "borderline mental retardation," "psychosis," and the critical finding of possible "organic brain damage," further demonstrating counsel's deficient performance. Counsel received the Report in the mail on January 22, 1994, in the middle of the guilt phase of the trial, but 11 days before Good and Fisher gave their testimony on February 2 during the penalty phase. By failing to act on the Report's contents

---

[3]The Report and Recommendation's reasoning, adopted by the district court, erroneously muses without foundation that the reason was strategic because "defense counsel consciously elected not to pursue such efforts while they were attempting to obtain specific enforcement of the plea agreement as reflected in an order of Gerrard Circuit Court entered in April of 1991, which stated that 'the parties shall not incur further expert witness fees until questions raised in a petition for a writ of prohibition are finally resolved.'" *Haight v. Parker*, No. 3:02-CV-206-S, 2015 WL 3548182, at *71 (W.D. Ky. 2015). The record is at best conflicting as to whether trial counsel agreed or was ordered not to expend funds during the period between 1985 and 1992, but, if the decision was indeed "strategic," it constituted deficient performance not to continue investigating Haight's background during this time, even if experts could not be retained. Nor does this explain why counsel waited another year after funds were released to hire experts.

immediately, counsel was deficient in at least two ways: first, by failing to give experts Good and Fisher access to the report before they testified at the penalty phase, and second, by failing to bring the Report to the attention of the trial court immediately. These failures of counsel resulted in missing the only opportunity to get evidence of Haight's possible brain damage before the jury. The majority fails to grapple with this critical error by trial counsel.

Not only did Counsel fail to bring the Report to the attention of the two experts upon its receipt, but the record also reveals that counsel made no attempt to get his experts' assistance concerning the Report before the completion of trial. In Haight's motion for a new trial or postponement of sentencing, filed on February 7, counsel requested that Dr. Eric Engum, a neuropsychologist, be allowed to examine Haight for possible brain damage. This was only five days after the conclusion of the penalty phase, which indicates that counsel had ready access to an expert who could have assisted counsel with interpreting the significance 1974 Report prior to the start of the penalty phase.

The record does not reflect why counsel did not give the 1974 Report to the two expert witnesses before they testified except for counsel's explanation that he did not have time during a capital trial to review it. As a result of counsel's apparent failure to even look at the Report upon receipt, no effort was made to utilize it in any way at trial, or to obtain any further evaluation of it from the existing experts or new experts between January 22 and February 2, 1994. Had counsel spent just a few minutes reviewing the report, or simply handed it over to his two retained experts to review, it is highly likely that the numerous "red flags" raised by the three mental health professionals who wrote the Report would have been considered during the mitigation phase. The significance of this inadequacy of counsel, is not only that the jury was not told about the 1974 Report's conclusions of "borderline mental retardation," "psychosis," "cortical dysfunction," and the possibility of "organic brain damage," but that counsel permitted Fisher to testify to exactly the opposite when he testified that Haight had "no psychosis or schizophrenia," no retardation, and no neurological deficits. Allowing Fisher to give this testimony despite the available evidence of significant mental abnormalities was deficient performance and prejudiced Haight.

That all these records existed prior to 1985, moreover, shows that proper investigation would have put counsel on notice that Haight may have suffered from brain damage even before receipt of the 1974 Report. Yet because counsel failed to adequately investigate Haight's background, it failed to obtain the appropriate mental health expert to explain to the jury the significance of the school, government, medical, and other available records as well as the possibility of brain damage and its likely effect on Haight's conduct. *See Wiggins*, 539 U.S. at 527–28.

Lastly, counsel performed deficiently by waiting until the penalty phase was completed before bringing the Report to the attention of the trial court in a motion for new trial. The trial court would likely have been more receptive to this reasonable request for a short delay in starting the penalty phase than it was to a new trial motion after completion of all proceedings.

The state court record establishes that the failure to adequately investigate and obtain an expert in brain damage cannot be justified as a reasonable strategic decision. When defense counsel is on notice of past incidents that would suggest brain damage, "[w]e can conceive of no rational trial strategy that would justify the failure of [defense] counsel to investigate and present evidence of his brain impairment . . ." *Frazier v. Huffman*, 343 F.3d 780, 794 (6th Cir. 2003) (counsel did no investigation into the presence of an organic brain impairment after learning from medical records that the defendant fell from a ladder). Counsel specifically stated at the hearing on the motion for a new trial that had he known about the information in the 1974 Report before trial, he would have been ineffective had he not investigated the possibility of brain damage further and hired a qualified expert to assist his preparation. Motion for New Trial Hr'g Trans. at 33–37. The available evidence demonstrates that the information in the 1974 Report, and other records from Haight's past, should have been investigated by and known to counsel prior to trial. Counsel's failure to obtain the appropriate expert was based not on strategy, but on lack of preparation. Counsel tacitly admitted at the hearing on the motion for a new trial that prior to receiving the 1974 Report he did not consider hiring a neurologist or neuropsychiatrist before trial, so the failure to do so was not strategic. Counsel fell below an objectively reasonable standard of performance given the numerous "red flags" that Haight likely suffered

from some form of brain damage.   Pursuant to § 2254(d)(1), the Kentucky Supreme Court unreasonably applied the deficiency prong of *Strickland*.

2. Unreasonable application of *Strickland* under § 2254(d)(2)

Under § 2254(d)(2), a petitioner may challenge a state court's conclusion that is based upon an unreasonable determination of the facts. Haight bases his federal challenge in part on the Supreme Court of Kentucky's decision in *Haight IV* to dismiss his ineffective assistance of counsel claim without affording him an evidentiary hearing and the opportunity to develop a factual record in state court.   At the time of the decision in *Haight IV*, the state court record included substantial and significant evidence that Haight likely suffered from brain damage, including the affidavit of Dr. Engum and the 1974 Report, as well as numerous other documents that clearly contradict  Fisher's testimony at the penalty phase that Haight did not suffer from brain damage or other neurologic deficiency.  Without the benefit of an evidentiary hearing or other factfinding regarding the factual discrepancies in the record, the Kentucky Supreme Court adopted the factual determination of Fisher that Haight did not suffer from brain damage and concluded that Haight's trial counsel was not ineffective.

Under § 2254(d)(2), a state's factual findings are entitled to a presumption of correctness, but a petitioner can rebut these findings by "clear and convincing evidence."   28 U.S.C. § 2254(e)(1); *see also Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).   Under § 2254(d)(2), the habeas court will not conclude that a state court's factual findings are unreasonable "merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain,* 576 U.S. 305, 313–14 (2015).   Instead, we defer to the state court's factual determinations if "reasonable minds reviewing the record might disagree about the finding in question.'" *Id*. at 314.   But "'deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).   "Clear and convincing evidence is a demanding but not insatiable standard, requiring proof that a claim is highly probable." *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1289 (11th Cir. 2016) (quotations omitted).   "Highly probable is a standard that requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Id*. (cleaned up).   Accordingly, if Haight can show that the state courts plainly

misapprehended or misstated the record in making their findings, and the misapprehension goes to a material factual issue that is central to his claim, that misapprehension can fatally undermine the factfinding process, rendering the resulting factual finding an unreasonable determination of the facts under § 2254(d)(2).

The Supreme Court of Kentucky affirmed the postconviction trial court's decision that Haight's counsel was not ineffective at mitigation, as well as denying further funding for experts and the request for an evidentiary hearing:

> Haight contends that he wanted to ask for funding for expert assistance in neuropsychology in order to prove ineffective assistance of counsel at trial. The trial judge correctly interpreted *Sanborn* in reaching its decision. This Court has already found that Haight had the full benefit of mental health evaluations and experts during his trial. *Haight [III], supra.*
>
> The expert offered by Haight [Eric Engum] said that there was a high degree of certainty that it's possible that Haight may suffer from brain damage which may be material in a defense based upon extreme emotional disturbance. This is mere speculation. An RCr 11.42 proceeding does not provide for a relitigation of the performance of trial counsel.

*Haight IV*, 41 S.W.3d at 444-45. While recognizing the deference that must be given to factual findings, the Engum affidavit is only one example from a state court record that, on balance, presents a starkly different picture of the possible cause of Haight's mental status than that presented by trial experts Fisher and Good. While Fisher's testimony recognized that Haight suffers from some abnormalities, for example, fluctuating IQ that might result from "neurological problems," Fisher, despite minimal testing of Haight and only spending six hours with him, testified that there "appears to be no indication that [Haight] is psychotic, suffers from serious neurological deficits, or is in any way retarded." Instead, Fisher attributes Haight's problems to lack of coping skills, unresolved conflicts, and an inability to manage stress. Fisher's testimony does not reflect that he was aware of the available records identifying Haight's multiple head traumas, difficult birth, prenatal injuries, poor academic record, adolescent drug and alcohol abuse, and multiple evaluations from Haight's childhood and teen years where Haight was determined to have a low-average IQ bordering on mental retardation.

In contrast to Fisher, Engum relied on testing of Haight, citing numerous historical records, to conclude that "[a]fter reviewing [the available records] it is my opinion . . . that there is a strong basis for inferring that Mr. Haight may suffer from brain damage, with one or more etiologies, and that the nature and extent of his cognitive dysfunction may be material to . . . mitigating the offense." A state court's factfinding may be unreasonable when the court "had before it, and apparently ignored," evidence supporting a petitioner's claim. *See Miller–El*, 537 U.S. at 346. The Kentucky Supreme Court ignored evidence in the record of Haight's brain damage when it labeled Engum's opinion that Haight may suffer from brain damage "pure speculation." Engum's opinion was based on testing and extensive review of Haight's background and childhood records—it was not speculation. That Court also failed to provide Haight any opportunity to develop a factual record on the issue of possible brain damage during the state proceedings, erroneously concluding that Haight had "the full benefits of mental health evaluations" when he clearly did not.

The federal district court simply assumed that the Kentucky Supreme Court appropriately evaluated Engum's affidavit, relying on its brief reference to "the expert offered by Haight." *Haight IV*, 41 S.W.3d at 445.[4] Its conclusion that the Kentucky Supreme Court evaluated the IAC-Mitigation claim is questionable given that Court's explicit reference to the Kentucky practice of barring "relitigation" of the performance of trial counsel in postconviction proceedings pursuant to *Sanborn v. Comm.*, 975 S.W.2d 905 (Ky. 1988), *overruled, Leonard v. Comm.*, 279 S.W.2d 151 (Ky. 2009). Without regard to the federal court's assumption, it erroneously called Engum's conclusion "mere speculation" when Engum's affidavit relied on testing and review of numerous detailed records, which are specifically identified by Engum in the affidavit. *See id.* at ¶¶ 8, 10. The evidence submitted in the postconviction motions filed by Haight directly contradict the penalty-phase testimony of Fisher that Haight did not suffer from

---

[4]The magistrate judge stated that:

> the Supreme Court of Kentucky was well aware that Haight had obtained a postconviction opinion of a mental health expert, Dr. Eric Engum, a forensic psychologist and clinical neuropsychologist, who concluded that a substantial possibility existed that Haight suffered from organic brain damage. Thus, the Kentucky Supreme Court was not unaware when it rejected Haight's ineffective assistance of counsel claim that other experts held out a possible diagnosis of brain damage.

*Haight v. Parker*, 2015 WL 13548182, at *73.

any neurologic deficits. Considering this conflicting evidence, the Kentucky Supreme Court improperly concluded that Engum was "speculating" when further factfinding was necessary to resolve the disputed facts in the record.

In addition, the postconviction trial court made a baseless, or at least uninformed, factual finding when it ruled that Fisher was an appropriate expert on brain damage. It made this finding without granting Haight's request for appointment of an expert to diagnose possible brain damage and then inform the court of its findings, and without holding an evidentiary hearing in which Haight could show why Fisher was not a qualified expert on brain damage. Likewise, the Kentucky Supreme Court erred by focusing only on the fact that Haight had a "mental-health expert" without engaging in any meaningful way as to whether counsel hired the correct type of expert as required by the professional standards at that time. *See* 1989 ABA Guidelines.

At issue here is not whether Haight suffers from brain damage, but whether his counsel's performance was deficient in discovering, analyzing, and presenting evidence of that brain damage to the jury during mitigation. The facts presented in the Engum affidavit and an abundance of other record evidence stands in direct conflict with the conclusions offered by Fisher at trial. As explained further below, the affidavit of Engum, as well as the three expert declarations offered by Haight and rejected in the district court, form the core of Haight's prejudice analysis under *Strickland* regarding his claim of ineffective assistance for failure to hire an appropriate expert. Accordingly, while "[a] rational fact-finder might discount [the affidavit] or, conceivably, find it incredible, . . . no rational fact-finder would simply ignore" the affidavit or fail to address it entirely. *See Taylor v. Maddox*, 366 F.3d 992, 1006 (9th Cir. 2004). The Supreme Court of Kentucky—in resolving disputed issues of fact, based on conflicting evidence and without an evidentiary hearing—made an unreasonable determination of the facts under § 2254(d)(2).

At bottom, trial counsel had evidence, or had access to evidence upon reasonable investigation, showing that Haight suffered significant head injuries in his youth and young adulthood, and that he abused drugs and alcohol from a young age. Both are "red flags" indicating possible brain damage. There existed substantial available evidence of brain damage—that Haight suffers from psychosis, delusions, borderline mental retardation, and low

IQ—yet it was never presented to the jury. Despite these red flags, trial counsel never sought neurological testing of Haight. "[C]ounsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527–28. Furthermore, counsel's own testimony at the hearing on the motion for new trial shows he knew his representation would be judged deficient if he did not investigate Haight's brain damage documented in the 1974 Report. And yet, no further investigation was undertaken for the penalty phase once that information was known to counsel.

Given the unusual procedural posture of this claim when it came to federal court, including the lack of an evidentiary hearing in state court on the IAC-mitigation claim and the since-overruled limitation in Kentucky on raising IAC claims in postconviction proceedings, I am dubious that it meets the definition of "adjudicated on the merits." But, because the Kentucky Supreme Court addressed the claim in its opinion in *Haight IV*, I agree with the majority and give the claim AEDPA deference. But I then part ways with the majority and would hold that the Kentucky Supreme Court unreasonably applied *Strickland* to the facts of this case based on counsel's failure to investigate and hire an appropriate expert to diagnose and opine on the issue of brain damage to the jury. As explained in the next section, this deficiency prejudiced Haight.

## B. Prejudice Prong under *Strickland*

In addition to demonstrating deficient performance, Haight must also demonstrate prejudice; he must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694. "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. "[P]rejudice exists if there is a reasonable probability that, but for his counsel's ineffectiveness, the jury would have made a different judgment about whether [Haight] deserved the death penalty as opposed to a lesser sentence." *Andrus v. Texas*, 140 S. Ct. 1875, 1885–86 (2020). This inquiry "will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 956 (2010).

"[B]ecause [Haight's] death sentence required a unanimous jury recommendation . . . , prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [Haight's] moral culpability." *Andrus*, 140 S. Ct. at 1886 (quoting *Wiggins*, 539 U.S. at 537–38).

To establish prejudice, the habeas petitioner must demonstrate that evidence that could have been presented "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Foust v. Houk*, 655 F.3d 524, 539 (6th Cir. 2011) (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005)).  Although the evidence cannot be cumulative to that presented to the jury, the Supreme Court has made clear that it has "never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented."  *Sears*, 561 U.S. at 954. When evaluating the reasonable probability of a different result in a capital sentencing proceeding based on allegedly inadequate or incomplete investigation by counsel, the court must consider the totality of the available mitigation evidence—both that presented at trial and evidence that could have been adduced at trial and was not.  In this case, we compare the expert testimony given at mitigation with the proposed expert testimony submitted in the postconviction proceedings to analyze Haight's claim of ineffective assistance for failure to retain the appropriate experts.  *See Wiggins*, 539 U.S. at 527-28, 534*; Williams*, 529 U. S. at 397–98; *James v. Ryan*, 679 F.3d 780, 810 (9th Cir. 2012) ("The measure of prejudice is the magnitude of discrepancy between what counsel did investigate and present and what counsel could have investigated and presented."), *vacated on other grounds*, 568 U.S. 1224 (2013).

In the district court, the magistrate judge concluded that the Kentucky Supreme Court made the "entirely reasonable" determination that Haight failed to demonstrate any prejudice "due to the absence of further expert testimony that he suffered from brain damage." *Haight v. Parker*, No. 3:02-cv-206, 2015 WL 13548182, at *74 (W.D. Ky. July 17, 2015).  But that conclusion begs the question because the reason no "further expert testimony" exists stems directly from trial counsel's deficient performance, coupled with the refusal of the trial court, postconviction court, and the federal court to allow further expert testimony into the record, despite Haight's repeated requests.

A comparison of the available evidence of brain damage with what was presented by trial counsel at mitigation reveals the significant amount of evidence the jury never heard. Haight's postconviction counsel found extensive evidence of Haight's likely brain damage stemming from illness, abuse and head trauma in childhood, and alcohol and substance abuse in his teens and adult years—evidence that should have alerted trial counsel to Haight's need for examination by a neurologist or neuropsychiatrist. Based on the available evidence, trial counsel was aware, or should have been, that Haight suffered numerous head injuries throughout his childhood and as an adult. This included falling from an automobile at age 2, receiving a blow to the head and losing consciousness while at the Methodist Children's Home, being hit by a car at age 14, being pistol whipped about the head at age 16, being hit in the head with a baseball, and receiving a very serious head injury after being hit with a horseshoe as an adult. RCr. 11.42 Motion at p. 21. There are also numerous references to the beatings Haight received from his father. Haight's mother was severely beaten by Haight's father while pregnant, drank alcohol to excess while pregnant, and took the drug Demarol. Haight's birth was also traumatic. He was delivered by forceps, and the umbilical cord was around his neck, resulting in a very low Apgar score. *Id*. Counsel also knew Haight had a history of drug and alcohol abuse during his adolescence, *id*. at 22, which can exacerbate existing brain damage, or cause brain damage itself.

The documents attached to Haight's Kentucky Civil Rule 59.05 Motion to Vacate are even more telling. Counsel submitted hundreds of pages of documents, many related to possible brain injury, that counsel intended to explore with witnesses at an evidentiary hearing scheduled at the postconviction stage. That hearing, however, was abruptly cancelled sua sponte and without explanation by the postconviction trial judge, Judge Shobe. Much of the evidence was included in Haight's RCr 11.42 motion, but because the trial court cancelled the evidentiary hearing where Haight planned to introduce and explain the evidence, Haight was forced to submit the evidence in a RCR 59.05 motion. The documents include evidence of school truancies, poor academic performance, armed robberies, destruction of property and abuse of animals when Haight was 14 and 15 (Attachment 2); a psychological evaluation when Haight was 13 that concluded that he might have "experienced cerebral dysfunction in his early school years, creating a serious academic difficulty" (Attachment 7); psychological testing when Haight was 14 that indicated his IQ had dropped from 86 at age 7 to 72, and noted that he functioned

near the borderline of retardation (Attachment 8); severe substance abuse beginning at age 12 with alcohol, marijuana, LSD, hallucinogens, and sniffing toluene, glue and gasoline, and taking cocaine, heroin, morphine, and dilaudid by age 14 (Attachment 10); prenatal substance abuse by Haight's mother, as well as beatings suffered by his mother during her pregnancy (Attachment 11); and numerous head traumas (Attachment 14). This is a sample of the evidence that Haight would have introduced at an evidentiary hearing to demonstrate that his trial counsel failed to adequately investigate his background. This failure to investigate resulted in trial counsel's failure to hire an appropriate expert to evaluate Haight and to present the powerful mitigating evidence of possible brain damage to the jury, thereby prejudicing Haight. *See Coleman v. Mitchell*, 268 F.3d 417, 447 n.15 (6th Cir. 2001) (noting there is a "direct relationship between the quality of background investigation and the quality of mitigation strategy")

The documents from the postconviction motions paint a picture of a sexually, physically, and emotionally abused child and teenager, largely abandoned by his family and failed by social workers and others in the foster-care system, much of which was not referenced during mitigation. Most important to the focus here, the documents include many references to incidents that might cause brain damage, as referenced above. All this evidence was available and discoverable to trial counsel before trial. The "red flags" indicating the need for further investigation into Haight's neurological functioning were present long before the 1974 Report came to light during trial in January 1994.

As the Supreme Court in *Rompilla* concluded when describing the significant mitigating evidence Rompilla's jury never heard:

> It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [defendant's] culpability," *Wiggins v. Smith*, 539 U.S. at 538 (quoting *Williams v. Taylor*, 529 U.S. at 398), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland*, 466 U.S. at 694.

545 U.S. at 393. The reasoning from *Rompilla* applies here. Trial counsel overlooked or ignored a "tidal wave" of available mitigating evidence that was used by postconviction counsel. *See Andrus*, 140 S. Ct. at 1887. The evidence not presented at mitigation but available to counsel

prior to trial—and uncovered and offered by postconviction counsel—differs in strength and subject matter from the evidence presented in mitigation. "[R]ather than being cumulative . . . , provides a more nuanced understanding of [Haight's] psychological background and presents a more sympathetic picture of [Haight]." *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008). The evidence of brain damage would have differed "in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) (quoting *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005)); *Rompilla*, 545 U.S. at 392–93. The jury heard none of this evidence, evidence that might well have influenced the jury's appraisal of Haight's culpability. Counsel's inadequate investigation resulted in the failure to find or to understand the significance of the numerous red flags in Haight's history pointing to the likelihood of brain damage, and, in turn, causing counsel not to hire an appropriate neurological expert.

In contrast to the information outlined above that should have alerted trial counsel to Haight's possible brain damage and the necessity for an expert well-versed in diagnosing and explaining brain damage, Haight's counsel procured the services of two expert witnesses: (1) Good, an associate professor of social work, who prepared a social history on Haight's family; and (2) Fisher, a clinical forensic psychologist who does not hold an M.D. or any specialized training in neurological functioning or brain damage. Good was first hired within a year or so after Haight's arrest in 1985, but she could not complete her work at that time due to lack of court-approved funding. She was rehired in 1993 and concluded her research and prepared a report. Fisher was not hired until one month before trial. He reviewed Good's report on December 17, 1993, and conducted two interviews with Haight, one each on December 27 and 28, 1993, two weeks prior to the start of trial.

The Kentucky Supreme Court held that Haight did not demonstrate deficiency or prejudice from counsel's failure to hire additional or different experts. It stated, without any analysis, "Defense counsel was not ineffective for relying on the opinion of an expert [Dr. Fisher] . . . who determined Haight had no significant neurological deficit." *Haight IV*, 41 S.W.3d at 446-47. In reaching this conclusion, the Kentucky Supreme Court incorrectly

characterized Dr. Engum's affidavit,[5] never referenced the records that indicate Haight likely suffers from a "neurological deficit" in contradiction to Fisher's testimony, and provided no basis for its conclusion that "Haight had the full benefit of mental health evaluations and experts during his trial." *Haight IV*, 41 S.W.3d at 445-47.

The state court's ruling that the two experts who testified for Haight provided all the expert assistance Haight needed to assist with mitigation seemingly relied only on the quantity of experts, not the quality or appropriateness of the testimony. Quality, not quantity, is the touchstone of an adequate investigation. *See, e.g., Rompilla*, 545 U.S. at 388. A review of the qualifications and testimony of Good and Fisher reveal that neither was professionally qualified to diagnose or opine on the effects of brain damage on Haight's conduct. Although trained to assess and explain some mental deficits and illnesses, Fisher's testimony would at best be of limited value because forensic psychologists, unlike neurologists or neuropsychologists, are not trained to diagnose or evaluate organic brain damage even if they suspect it exists. That point was driven home when Fisher testified that Haight "might" have neurologic deficits, but apparently did not recognize that it could be important information requiring further investigation by a neurologist, given the possible impact a brain-damage diagnosis could have on the jurors. Fisher gave precisely the opposite information to the jury. Despite admitting that he undertook limited testing of Haight and was not qualified to give such a diagnosis—he testified that "[t]here appears to be no indication that this man is psychotic, suffers from serious neurologic deficits, or is any way retarded." Fisher Trial Test. at 27. This testimony was one of

---

[5]Engum, Ph.D., concluded that "there is a strong basis for inferring that Mr. Haight may suffer from brain damage" and that Haight suffered from this defect in 1985 at the time of the murders. The brain damage may have resulted from (1) his mother's ingestion of alcohol in the months preceding his birth; (2) multiple head injuries he suffered as a child; (3) substance abuse, including hallucinogens and glue sniffing from age 12; or (4) a combination of some or all of these factors. In other words, this mental defect dates back to his childhood, which is relevant to his moral culpability and determination of the appropriate sentence.

In support of his request for an evidentiary hearing, Haight included in his habeas petition three declarations from Myla H. Young, Ph.D., a neuropsychologist; David M. Benjamin, Ph.D., a psychopharmacologist; and George W. Woods, Jr., M.D., a neuropsychiatrist. The experts' declarations present conclusions gleaned from childhood records; reports and interviews by Good and Fisher at trial; the 1974 Ohio prison report; and other sources, that Haight was likely brain damaged since childhood, and perhaps from birth. They state that the damage in childhood was likely exacerbated by drug and alcohol abuse. These experts from fields at issue in Haight's claim concluded that his condition was present at the time of the murders, and that the brain disorder significantly contributed to Haight's criminal activity. Though these experts were proffered to demonstrate prejudice by showing what evidence counsel should have presented during mitigation, the district court refused to consider the declarations because they were prepared for the habeas petition and are not part of the state court record.

the primary bases for the Kentucky courts' continued denial of further factfinding, including expert assistance, and their conclusion that his counsel was not ineffective. Haight suffered prejudice because Fisher's testimony was lacking in the critical information the sentencing jury needed to hear about brain injury, and instead gave damaging conclusions that were beyond his expertise.

Good testified about Haight's poor upbringing, including time in foster homes, and the lack of stability in his childhood. Fisher's testimony was largely duplicative of Good's. They both testified about Haight's unstable childhood and his drug and alcohol abuse as an adult, focusing on the same facts that formed the basis for Haight's guilt-phase defense of extreme emotional disturbance. Dr. Fisher testified that Haight's chronic drug and alcohol abuse were simply "coping mechanisms" without mentioning the brain changes that may result from chronic drug and alcohol abuse, especially if there is underlying brain damage, or that the substance abuse began in adolescence as Haight's did. Fisher summarily concluded that Haight did not suffer from any "serious neurological deficits" or intellectual disability.

The testimony of Good and Fisher demonstrates that even though they knew of Haight's long history of drug and alcohol abuse, they did not or could not explain how Haight's drug and alcohol abuse could cause or exacerbate any existing brain damage. For example, both Fisher and Good referenced Haight's low IQ and noted that the fluctuations and the drop in his IQ from childhood to teenage years was indicative of something "serious," without further explanation. Brain damage as a possible cause was either not within their experience or expertise, or it did not otherwise occur to them as a possible cause of Haight's behavior. Apparently, it did not occur to counsel either, an omission that prejudiced Haight and may cost him his life.

Prejudice is especially likely here because the jury told the judge it was "stalemated" after several hours of deliberation during the penalty phase, but the judge sent them back to deliberate further. The jury's apparent difficulty in reaching a decision regarding the appropriate penalty lends weight to Haight's prejudice argument that if counsel had presented competent proof of possible brain damage in mitigation, there is a reasonable probability that at least one juror would have voted for life imprisonment instead of the death penalty. *See Williams,* 529 U.S. at 396.

In sum, there is at least a reasonable probability that development and presentation of testimony by a neurologist and/or neuropsychologist about possible brain damage would have changed the result of the sentencing proceeding. Therefore, I conclude that Haight has demonstrated prejudice under *Strickland*. *See Boyde v. California*, 494 U.S. 370, 382 (1990) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)).

Mitigation evidence existed establishing that Haight's life was not only disadvantaged but so physically, mentally, and emotionally destructive as to result in brain damage and substantial emotional and mental problems. The significant amount of evidence supporting that conclusion was never presented to the jury—a jury that reported itself to be "stalemated" on the penalty after several hours of deliberation and on which only one juror was needed to change the penalty outcome. In sum, for the reasons explained above, I would issue the writ based on ineffective assistance of counsel at mitigation and remand to the state court to conduct a new penalty phase. I therefore respectfully dissent from Section III.C of the majority opinion.